**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| SHADRON STASTNEY, ALASTAIR | ) | |
| CRAWFORD, ASAF GOLA, KEVIN | ) | **JURY TRIAL DEMANDED** |
| GOLLOP, KRZYSZTOF KABACINSKI, | ) | |
| PATRICK MILES, ROBERT PETCH, | ) | ███████████████████████████ |
| JOHN DOES 1-75 | ) | |
| | ) | |
| Defendants. | ) | PUBLIC VERSION FILED: June 24, 2022 |

## COMPLAINT

COMES NOW Plaintiff Stream TV Networks, Inc. ("Stream TV" or the "Company"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 8, stating its Complaint against Defendants, alleging as follows:

## NATURE OF ACTION

1.      This is a $500,000,000.00 tort damages case.  Defendants stole Plaintiff's assets and intellectual property via a complicated hostile takeover conspiracy of internal business sabotage and bribery.  The Supreme Court of Delaware *en banc* recently declared that unlawful takeover scheme void *ab initio*.  During their period of unlawful control of the assets, Defendants valued the stolen technology at $560 million in their public investment solicitations.  Now, Defendants are liable in damages for conduct already declared unlawful by a unanimous Delaware Supreme Court, in damages grounded at least upon valuations that Defendants themselves published.

1

2.      Defendants are not good faith investors who made an honest mistake.  They are serial malfeasants in crooked takeover schemes and also frequent defendants in sanctions proceedings by U.S. federal authorities.

3.      Defendant Shadron L. Stastney ("Stastney") runs unlawful takeover schemes as his personal business model and has been sued up and down the East Coast at least six times for defrauding investors in similar shady gambits.  He also has paid a $3 million fine to the SEC for fraudulently concealing his personal interests in such takeover schemes.  This time around, he engaged a co-conspirator: Alistair Crawford.

4.      Defendant Alastair Crawford ("Crawford") is a serial litigant who, spurned by not receiving undeserved commissions, began a campaign to smear Stream TV's controlling stockholders with the goal of taking over Stream TV and its assets.

5.      In 2019 and early 2020, Stastney and Crawford concocted a scheme to bribe a series of Plaintiff's managers to sabotage: (a) Plaintiff's exercise of certain debt conversion rights held against Plaintiff's secured debtholders, (b) Plaintiff's recapitalization via an equity issuance, which rendered their (anyway converted) debt instruments obsolete; and (c) Plaintiff's ability to raise funds and sell products.  The point of the conspiracy was to destroy Stream TV from the inside, to cause default events on certain debt instruments that the conspirators had acquired, and thereafter to use those manufactured default events as a pretext for co-conspirators to sign over all assets of Stream TV to a shell company, SeeCubic, Inc., controlled by the conspirators, for zero dollars, through an Omnibus Agreement (Ex. A).  Stastney and Crawford employed the other Defendants to carry out their scheme.

6.      The scheme was grounded upon bribing at least three of Plaintiff's managers and directors: Defendants Kabacinski, Gollop, and Gola.  The debtholders promised those managers

lavish compensation within a future investment vehicle (some of which has since been paid), as a quid pro quo for manufacturing default events within Stream TV and for putting Stream TV's assets and intellectual property under the control of the Defendants. Gollop and Gola were each paid a substantial amount for their participation in the conspiracy. Kabacinski cut a better deal for himself and was paid §390,000. Additionally, all received stock in the newly formed entity that received Stream TV's assets.

7.      Kabacinski and Stastney in turn bribed other managers and contractors to facilitate and carry out the conspiracy. For example, Kabacinski bribed Kaushik Banerjee ("Banerjee"), Stream TV's Vice President of Engineering, to transfer an IT server holding critical intellectual property from Stream TV to the conspirators. In return, Kabacinski promised Banerjee a $2 million contract in a subsequent shell company to manage the technology. But Kabacinski double-crossed Banerjee and failed to pay the bribe after Banerjee upheld his end of the illegal bargain to steal the server. That double-cross resulted in California fraud litigation through which many facts of the conspiracy came to light.

8.      For a time, Defendants' conspiracy succeeded due to a series of unfortunate erroneous rulings by the Delaware Court of Chancery beginning in December 2020. But on June 15, 2022, the Delaware Supreme Court sitting *en banc* reversed the Court of Chancery and definitively ruled that Plaintiff is now and was always the lawful owner of Plaintiff's own assets and intellectual property. Defendants never had any right to Plaintiff's assets and intellectual property; their takeover scheme was unlawful.

9.      Because Defendants never held any right whatsoever to Plaintiff's property, all of Defendants' exercise of dominion and control over that property from January 2020 to today constitutes tort conversion. The Defendants conspired together to convert Plaintiff's assets and

intellectual property, and thereafter to monetize it for their own benefit, at a publicly stated valuation of $560,000,000.00. Defendants stole Plaintiff's property under fraudulent color of law, at their own peril, hoping they could outlast Plaintiff in the prior litigation before being called to account. Defendants' unlawful conspiracy bet did not pay off, and all Defendants are now liable in tort for the harm their unlawful scheme caused Plaintiff.

## PARTIES

10.     Plaintiff Stream TV Networks, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Stream TV is a new media company founded in 2009 that aims to advance the evolution of display technology from a flat 2-D world to an immersive one made possible in 3-D without the viewer needing to wear special 3-D glasses.

11.     The Rajan family controls Stream TV. Mathu Rajan holds 18,000 shares of Class A common stock. An investment vehicle owned by Mathu Rajan, his brother, Raja Rajan, and their parents holds the majority of Stream TV's Class B voting stock.

12.     In addition to the Rajan family, 116 investors own 7,698,964 Class B voting shares of Stream TV.

13.     Defendant Shadron L. Stastney is a resident of New Jersey. Stastney was a director of Stream TV from 2011 through 2014, when he resigned because he faced sanctions from the Securities and Exchange Commission, in an action captioned *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sep. 18, 2013). Stastney later re-engaged with Stream TV as a director from approximately September 2018 to January 2020 and Chief Financial Officer from December 1, 2018 to January 30, 2020. Stastney is also the Managing Member of SLS Holdings VI, LLC ("SLS"). SLS in turn is Stream TV's senior secured creditor, on convertible notes for approximately $6 million.

4

14.     Defendant Alastair Crawford is a resident of the United Kingdom and an investor in Stream TV.

15.     Defendant Patrick Miles is a resident of the United Kingdom and an investor in Stream TV.

16.     Defendant Robert Petch is a resident of the United Kingdom and an investor in Stream TV.

17.     Defendant Asaf Gola is a resident of New York.  Gola is an equities trader and portfolio manager by training, previously employed by various investment banks and capital managers.  From approximately March until May 2020, Gola was briefly a director of Stream TV.  Gola joined the Stream TV Board as an act in furtherance of the conspiracy alleged in this Complaint, for the specific purpose of unlawfully signing over Stream TV's assets to shell companies owned by the other Defendants.  In exchange, Gola was awarded the position of Head of Capital Markets at one of those shell companies, SeeCubic, at which he is currently employed in New York, and, on information and belief, was also paid the a substantial amount.

18.     Defendant Kevin Gollop is a resident of Jersey of the United Kingdom Channel Islands.  Gollop is an insurance broker by training, specializing in maritime insurance.  He later owned various Jersey-based consultancies and investment firms.  He currently is Managing Director of a Jersey-based maritime industry recruitment firm known as Channel Ship Services.  From approximately March until May 2020, Gollop was briefly a director of Stream TV.  Gollop joined the Stream TV Board as an act in furtherance of the conspiracy alleged in this Complaint, for the specific purpose of unlawfully signing over Stream TV's assets to shell companies owned by the other Defendants.  In exchange, Gollop was paid the a substantial sum.

5

19.     Defendant Krzysztof "Kris" Kabacinski is a resident of the United Kingdom. Kabacinski was CEO and recently demoted to Chief Strategy Officer of SeeCubic and was described on its website as "one of two founding architects of its current corporate structure," which he structured and operated specifically to carry out the unlawful conspiracy described in this Complaint. Kabacinski was previously an executive of MEON Corporate Group, which *inter alia* manages paving projects in Central Europe.  Kabacinski briefly served on the Board of Stream TV from March to May 2020, to which he was appointed at the request of Stastney and Crawford in furtherance of the conspiracy described in this Complaint.  In exchange, on information and belief, Kabacinski was paid $390,000 and given a large amount of stock in SeeCubic.

## JURISDICTION AND VENUE

20.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) (diversity jurisdiction) because there is complete diversity of citizenship between Stream TV and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     The Court has personal jurisdiction over Stastney pursuant to 10 *Del. C.* § 3114 because he was at the relevant time, a director and officer of Stream TV, a Delaware corporation.

22.     The Court has personal jurisdiction over Stastney pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

23.     The Court has personal jurisdiction over Crawford pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

ME1 41178620v.1

24.     The Court has personal jurisdiction over Miles pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

25.     The Court has personal jurisdiction over Petch pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

26.     The Court has personal jurisdiction over Gola pursuant to 10 *Del. C.* § 3114 because was at the relevant time a director of Stream TV, a Delaware corporation.

27.     The Court has personal jurisdiction over Gola pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

28.     The Court has personal jurisdiction over Gollop pursuant to 10 *Del. C.* § 3114 because he is, or was at the relevant time, a director of Stream TV, a Delaware corporation.

29.     The Court has personal jurisdiction over Gollop pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

30.     The Court has personal jurisdiction over Kabacinski pursuant to 10 *Del. C.* § 3114 because he is, or was at the relevant time, a director and officer of Stream TV, a Delaware corporation.

31.     The Court has personal jurisdiction over Kabacinski pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

32.     Venue is proper under 28 U.S.C. § 1391.

7

## FACTS

**A.     Stream TV**

33.     Between 2009 and 2020, Stream TV raised approximately $160 million through equity investments, unsecured convertible debt, and direct loans.  Stream TV used those funds to further develop its 3D technology by obtaining numerous patents,  improving image resolution, increasing the size of the displays, developing mobile-type tablets, and moving algorithms into hardware (which reduces costs and makes the technology compatible with most devices in the industry).

34.     Eventually, Stream TV perfected its mass production "bonding" process – precise gluing of proprietary lenses to video panels with sub-pixel accuracy – which major competitors such as Philips Electronics and Dolby have not achieved. Stream TV thereafter pivoted to readying its technology for implementation into the devices of major industry players that sell TVs, tablets, laptops, and mobile phones.

35.     Stream TV's assets include two optical bonding lines – a Mass Production Line and a Small Production Line that can be used to bond products for all three technology platforms: Two-View, Multi-View, and Stream TV's proprietary Ultra-D™.

36.     Stream TV grew to over 100 employees and consultants worldwide.

37.     Through one of its Netherlands subsidiaries, Stream TV entered into an agreement with Robert Bosch GmbH in March 2020 to co-develop a glasses-free 3D instrument cluster for the automotive market.

38.     During this critical commercialization period in early 2020, Stream TV suffered financial challenges.  As it had through its past $160 million of prior capital raises, Stream TV intended to address its liquidity requirements with an additional capital raise.

8

39.     Stream TV's secured creditors had signed certain debt-to-equity conversion agreements in 2018. And, in 2020, Stream TV was weeks away from signing a major commercialization agreement with Alphabet, Inc., the parent company of Google.

40.     Stream TV did not declare Chapter 11 bankruptcy or take other judicial reorganization acts during those early 2020 financial difficulties because it instead intended to raise capital (as it had successfully done in the past) after announcing its anticipated contract with Google.

**B.      Stream TV's Charter Guarantees Blocking Rights to the Class B Voting Shareholders to Veto Asset Transfers**

41.     Stream TV's December 17, 2018 Third Amended and Restated Certificate of Incorporation (the "Charter," Ex. B) expressly requires Class B voting shareholder approval for all possible transactions that could remove control of Stream TV's technology from the Class B voting shareholders (including the Rajans), however named.  This provision was originally added in 2013, and Stastney voted in favor of adding this provision.

42.     Charter § IV.D.2(d) (the "Class Vote Provision") provides:

> **Separate Vote of Class B Voting Stock**. For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation [sic] an Acquisition or Asset Transfer.

43.     Charter § IV.D.4(b) further defines the term "Acquisition" as:

> (A) *any consolidation, stock exchange or merger* of the Company with or into any other corporation or other entity or person, *or any other corporate reorganization*, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; *or*

9

> **(B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred** provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof.

(emphasis added).  And, the term "Asset Transfer" is defined as:

> a sale, lease or other disposition of all or substantially all of the assets or intellectual property of the Company or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

### C.      Stream TV's Secured Creditors

44.      In 2011 and 2012, SLS loaned Stream TV $6 million via multiple senior notes, secured against all assets of Stream TV and its subsidiaries.

45.      Between 2014 and 2020, Hawk Investment Holdings Limited ("Hawk") loaned Stream TV over £50 million plus $1.336 million through a series of 17 separate notes.   Stream TV also pledged its assets for those notes subject to SLS's senior security, thereby rendering Hawk a junior secured creditor.

46.      Under separate conversion agreements between and amongst Stream TV, Hawk, and SLS, all of the notes issued to Stream TV by Hawk and SLS would convert to equity in the event Stream TV raised additional capital.  Under each of the conversion agreements, Stream TV had the sole and unilateral discretion to convert debt to equity.

### D.      The Conspiracy to Take Stream TV's Assets

47.      Stastney was an early investor in Stream TV and was on its Board from 2011 until 2014.  Stream TV was unaware of Stastney's legal troubles and his history of takeovers when he joined Stream TV.

48.     At some point, Stream TV became aware that Stastney had legal issues with the SEC.  While he was being investigated by the SEC, Stastney voluntarily quit Stream TV's Board.  He was reappointed to the Board by the other Board members in 2018 without the Rajans' consent or knowledge.  Stastney was promoted to Vice-Chairman without prior consultation of the Rajans.  Stastney was also named CFO at the insistence of Crawford.  Stastney resigned his Board and CFO positions on January 30, 2020 so that he could pursue his takeover scheme.

49.     Similarly, Stream TV was unaware of Crawford's character and history when he first became an investor.  Stream TV originally had a good relationship with Crawford, who brought numerous investors to Stream TV.

50.     Stream TV had a good relationship with Stastney until 2018.  Upon information and belief, Stastney became unhappy with the Rajans' leadership of Stream TV at the end of 2018 because he feared that Stream TV's fundraising efforts would cause him to lose the control and influence that he had regained in Stream TV, and he was concerned that SLS's loans would be converted to equity despite having previously signed the conversion agreement.

51.     Further, Stastney was unhappy with his inability to receive payment on the senior debt owned by SLS, even though payments were not yet due on those loans.  Stastney's conversion agreement permitted Stream TV to convert the $6 million of senior debt owned by SLS (controlled by Stastney) to common equity.  Stastney did not want his debt converted despite having previously signed the conversion agreement.  The Rajan family wished to execute Stream TV's conversion rights against SLS, clearing Stream TV's balance sheet to ramp up fundraising efforts to go to mass production.

52.     Stastney proposed an alternative to converting the SLS debt into equity: instead, Stream TV should repay SLS $6 million loan dollar-for-dollar using funds from the intended

capital raise.  Further, Stastney proposed that a sweep account be set up whereby Stream TV's new investment funds, in excess of a certain amount, would be swept into an SLS bank account.  The funds that would have been swept into that account would have surpassed the amount owed to SLS.  Unsurprisingly, the Rajan family rejected Stastney's alternative proposal.

53.     Upon information and belief, Crawford became unhappy with the Rajans' leadership of Stream TV in late 2016 or early 2017.  Crawford's discontent resulted from his desire to receive unwarranted commissions from the fundraising efforts of others.  When he did not receive the unwarranted commissions, Crawford began his multi-year smear campaign to damage the Company and the Rajans.

54.     Upon information and belief, as early as 2018, Stastney and Crawford began to work together to take control of Stream TV and transfer its assets and intellectual property to a new company they would control together, later incorporated as SeeCubic, Inc.  Upon information and belief, Stastney and Crawford recruited Miles, Petch, and John Does 1-75 to aid in their effort to take control of Stream TV and its assets.

55.     Upon information and belief, Stastney, Crawford, Miles, Petch, and John Does 1-75 actively worked to prevent Stream TV from raising money.  The goal of this effort was to force Stream TV to default on its secured loans and enable SLS and Hawk as secured creditors to seize Stream TV's assets.

56.     As part of this effort, Crawford began defaming the Rajan family to investors as early as the summer of 2018.  Indeed, Crawford falsely alleged to investors that the Rajans had committed fraud and were lying to investors.

57.     Upon information and belief, Stastney, Miles, Petch, and John Does 1-75 similarly defamed the Rajans in an attempt to prevent Stream TV from raising funds so that Stream TV's secured creditors could notice a default of the secured loans.

58.     In November 2019, months before the signing of the Omnibus Agreement, and while he was still a director and CFO of Stream TV, Stastney offered employment in SeeCubic to numerous key Stream TV employees, including Kaushik Banerjee.  Stastney used these promises of employment as bribes to Stream TV employees to effectuate the takeover of Stream TV and transfer of assets to SeeCubic.

59.     In January 2020, before the Omnibus Agreement was signed, in anticipation of loan defaults that had not yet occurred, and while he was still a director and CFO of Stream TV, Stastney directed Stream TV employees to restrict access to servers containing vital intellectual property and computer source code.  Stream TV management, engineers, and contractors were blocked from using the software, thus interfering with contracts and opportunities, causing millions of dollars in damages.

60.     Also in January 2020, Stastney shared his detailed plan for transferring Stream TV's assets and intellectual property with Crawford.  Upon information and belief, Crawford agreed with Stastney's plan and aided in its execution.  Upon information and belief, Miles, Petch, and John Does 1-75 were informed of the plan and aided in its execution.  Upon information and belief, the Defendants rewarded themselves with millions of shares in SeeCubic.

61.     Stastney resigned from his roles as a member of Stream TV's Board and CFO on January 30, 2020, to allow himself to declare Stream TV in default on its loans to SLS.  Litigation ensued.

62.     Historically, as controlling shareholders, Mathu and Raja Rajan served as the sole members of Stream TV's Board of Directors (the "Board").   Between 2011 and 2014,[1] Stastney served as an outside director, and later rejoined the Board as Vice Chairman in 2018 until resigning in January 2020.  Two other outside directors, Leo Hindery and Mark Coleman, also served on the Board between 2015 and July 2019.

63.     When Stastney's proposed "sweep account" was rejected by the Rajans, Hindery and Coleman left the Stream TV Board. The Rajans agreed to replace them and to further expand the Board to satisfy the Defendants' requests.

64.     In February 2020, four new outside directors were invited to join the Board: Kabacinski, Gola, Gollop, (the "Outside Directors") and Frank Hodgson.

65.     In May 2020, in furtherance of the takeover plan and without prior notice to the Rajans, Kabacinski, Gola and Gollop voted to negotiate a reorganization with Stream TV's secured creditors to address Stream TV's financial difficulties.  Hodgson left the meeting early and did not participate in any voting that day. Upon information and belief, the Outside Directors were acting upon instructions from the other Defendants.  As part of this endeavor, Gola proposed that the Board create a Resolution Committee, comprised of himself and Gollop, to "resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of Stream."  The Rajans requested time for a legal review of the proposal, but the request was

---

[1]  Stastney settled a set of SEC charges regarding breaches of fiduciary duty in unrelated investments in September 2013.  The settlement *inter alia* barred Stastney from investment advisory work for 18 months.  The SEC settlement is public record. *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sep. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

denied, and the Resolution Committee was formed by a vote with the Rajans abstaining from the Board vote.

66.     As described herein, Gola and Gollop, acting as the Resolution Committee, purported to bind Stream TV to an Omnibus Agreement in May 2020 to effect that takeover goal.

67.     Upon information and belief, other, unknown individuals participated in the conspiracy discussed in this Complaint.

**E.      The Omnibus Agreement and Secret Letter Agreement**

68.     In January 2020, Crawford, Miles, and a number of other investors filed a lawsuit against the Rajans in the Court of Chancery of the State of Delaware, captioned *Crawford v. Rajan*, No. 2020-0004-JTL.  Upon information and belief, the goal of the lawsuit was to block Stream TV's ability to raise money, and thus allow Crawford's co-conspirators to allegedly foreclose on their secured debt.

69.     On March 9, 2020, SLS noticed default of its secured notes. The default notice sparked a flurry of activity among Stream TV's investors, which eventually led to the appointment of the Outside Directors and creation of the Resolution Committee on May 4, 2020.

70.     On March 23, 2020, before the creation of the Resolution Committee, SLS commenced litigation in the Delaware Superior Court against Stream TV and three of its wholly owned subsidiaries for, among other things, the transfer of collateral subject to SLS's loan agreements with Stream TV (the "SLS Lawsuit"). The Superior Court assigned a hearing date of June 2021, nearly 14 months after the filing date. If Stastney wanted to seize Stream TV's assets quickly, he would have to find another way.

71.     On or about May 6, 2020, Gola and Gollop, acting as the Resolution Committee without input from any other director, third-party legal consultation, or interaction with Company

management, delivered the Omnibus Agreement, signed by them, purporting to bind Stream TV to a global settlement of pending litigations. The Omnibus Agreement also contemplated the transfer of all of Stream TV's assets to a "Newco" established and controlled by SLS and Hawk. "Newco" was later identified as SeeCubic.

72. The Outside Directors did not obtain approval for the Omnibus Agreement from Stream TV's Class A or B stockholders, even though Class B stockholder approval is specifically required by the Company's Charter for transfer of all or substantially all of the Company's assets.

73. In addition to Gola and Gollop, the Omnibus Agreement was also signed by: (i) Stastney, on behalf of SLS as its managing member, (ii) Emma McIntosh and Lee Mealing as authorized signatories for Albany Directors Limited, as sole director of Hawk, and (iii) Crawford, Petch, and Miles on behalf of a group of 52 of Stream TV's investors.

74. On information and belief, the execution of the Omnibus Agreement by Gola, Gollop, Crawford, Petch, and Miles was orchestrated by all of the Defendants to circumvent the proper adjudication of the SLS Lawsuit, such that Defendants would obtain possession of Stream TV's assets before their alleged right to these assets was adjudicated by the Delaware Superior Court. Also in this way, Defendants were able to take the entire value of Stream TV, not just what the secured creditors were allegedly owed.

75. By its terms, the Omnibus Agreement transferred all of Stream TV's assets to SeeCubic in lieu of SLS and Hawk foreclosing on Stream TV's assets. In this way, the Defendants thwarted the rights of the Class A and Class B shareholders entitled to vote on this transaction under the Charter, and illegally took possession of all of Stream TV's assets.

76. The Omnibus Agreement also provided for the issuance of one million shares in SeeCubic to Stream TV, though that issuance was never effectuated. Stream TV's Class A

16

common shareholders, other than the Rajans who were expressly excluded, were granted the right to "exchange" their Class A common shares for the equivalent number of shares of SeeCubic's common stock for no cost.  The Defendants were able to give themselves a larger ownership interest in SeeCubic than they had in Stream TV, and thus enrich themselves.

77.     In connection with the Omnibus Agreement, SLS, Hawk, and certain of Stream TV's equity investors (including Crawford, Miles, and Petch) also executed a secret Letter Agreement dated May 6, 2020.  (Ex. C).  The existence of this Letter Agreement was purposely hidden from the Rajans until it was discovered during litigation.

78.     The Omnibus Agreement incorporated the secret Letter Agreement, under which Stream TV was obligated to issue 48 million new shares of Stream TV Class A common stock to SLS, Hawk, and certain investors that could be immediately converted into shares of SeeCubic common stock.

79.     The first Whereas clause of Letter Agreement expressly conditions the Omnibus Agreement upon the additional terms of the Letter Agreement.

80.     Those 48 million shares are precisely numbered to shift majority voting control from the Rajans, whose voting control within Stream TV would decline to 49.9%.

81.     The Omnibus Agreement therefore not only transferred all of Stream TV's assets to SeeCubic and exchanged Stream TV's common shares for SeeCubic's common shares, but it also granted SeeCubic an option to take majority voting control of Stream TV whenever it likes.

82.     Specifically, the Letter Agreement contemplates that Hawk shall receive 40,000,000 shares of Stream TV's Class A common stock, which Hawk shall then be entitled to exchange for a pro rata portion of SeeCubic's common shares.

83.     The Letter Agreement also provides that SLS shall receive 4,000,000 shares of Stream TV's Class A common stock, which SLS would be able to exchange for a pro rata portion of SeeCubic's common shares.

84.     In addition, the Letter Agreement provides that the investors signing the Omnibus Agreement would receive (i) 4,000,000 shares of Stream TV's Class A common stock, and (ii) 2,000,000 warrants of Stream TV.  Each investor was entitled to exchange these shares for a pro rata portion of SeeCubic's common shares.

**F.     Defendants Use the Unlawful Omnibus Agreement and Seize Control of Stream TV and Its Assets**

85.     Following the Resolution Committee's approval of the Omnibus Agreement through Gola and Gollop, and the execution of the Omnibus Agreement on May 6, 2020, Defendants commenced their premeditated plan to take control of Stream TV and its assets, and to divert Stream TV's assets to SeeCubic, which is owned and controlled by Defendants. Defendants described their plan as a coup.

86.     Defendants began by sending a letter to Stream TV's shareholders informing them of the takeover.  However, Defendants were only able to procure a list of shareholders after Kabacinski bribed a current Stream TV employee with the promise of employment at SeeCubic.

87.     Defendants strong-armed Stream TV's investors into becoming investors of SeeCubic.  Stream TV's investors were presented with two options – convert their ownership of Stream TV into ownership of SeeCubic, which would hold all of Stream TV's assets and intellectual property, or continue to own Stream TV, which would have no assets or intellectual property.

18

88.     Defendants went to great lengths to harass investors that backed the Rajans, including showing up at one investor's house unannounced and, upon finding out that the investor was not home, defaming the Rajans to the investor's wife.

89.     Upon information and belief, Defendants transferred all of Stream TV's assets and intellectual property to SeeCubic for their own gain.  For example, Defendants improperly caused the assignment of Stream TV's trademarks to SeeCubic.

90.     Beginning at least in September 2021, Defendants also caused the destruction of assets rightfully owned by Stream TV.  For example, in September 2021, Stastney instructed a contract partner in Hong Kong to destroy 500 specialty lenses used to calibrate certain asset machinery.

91.     Defendants' mismanagement of Stream TV and its assets has caused substantial damage to Stream TV.  For example, Defendants' unreasonable requests to Google caused it to pull out of a contract that had been negotiated before Defendants took control of Stream TV's assets.

92.     Upon information and belief, SeeCubic lacked any assets or capital until the Defendants transferred Stream TV's valuable assets to SeeCubic.

93.     Upon information and belief, Defendants used Stream TV's assets to raise capital in SeeCubic to enrich themselves.

94.     Stastney benefited from the improper theft of Stream TV's assets because he owns or controls shares of SeeCubic's stock and was named the Executive Chairman of the Board of SeeCubic.

95.     Crawford benefited from the improper theft of Stream TV's assets because he owns or controls shares of SeeCubic's stock.

96.     Gola benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors.

97.     Gollop benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors.

98.     Kabacinski benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors and was made CEO of SeeCubic.

99.     Upon information and belief, Miles benefited from the improper theft of Stream TV's assets because he received shares of SeeCubic's stock as part of the Omnibus Agreement.

100.    Upon information and belief, Petch benefited from the improper theft of Stream TV's assets because he received shares of SeeCubic's stock as part of the Omnibus Agreement.

101.    Upon information and belief, John Does 1-75 benefited from the improper theft of Stream TV's assets because those individuals received shares of SeeCubic's stock as part of the Omnibus Agreement.

G.      **The Omnibus Agreement is Invalid Because Stream TV's Charter Bars Transfer of Stream TV's Assets Without the Approval of the Class B Shareholders**

102.    On June 15, 2022, the Delaware Supreme Court issued an opinion finding that the Omnibus Agreement was not valid because Stream TV's Class B Shareholders did not vote to approve it.

103.    Thus, the Supreme Court's ruling confirms that Gollop and Gola wrongfully caused Stream TV to enter into the Omnibus Agreement and that Defendants' appropriation of Stream TV's assets was unlawful.

**Count I—Conversion (All Defendants)**

104.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

20

105.    As described above, by orchestrating a plan to manufacture Stream TV's default on the notes, which then paved the way for the Omnibus Agreement, Defendants unlawfully used this scheme to appropriate Stream TV's assets through the Omnibus Agreement.

106.    Stream TV possesses, and has always possessed, a property interest in and right to possess its assets and intellectual property.

107.    Defendants wrongfully exercised dominion and control over Stream TV's assets by manufacturing a default event, improperly approving and causing the approval of the Omnibus Agreement, taking Stream TV's assets and giving them to SeeCubic, and, in some cases, disposing of certain assets as if they were Defendants' own assets.

108.    As a direct result of Defendants' conversion of Stream TV's assets, Stream TV has suffered damages in an amount to be determined at trial.

**Count II—Civil Conspiracy (All Defendants)**

109.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

110.    Defendants conspired together and knowingly participated in a scheme to wrongfully convert Stream TV's assets for their personal benefit.

111.    In furtherance of the conspiracy, Stastney and Crawford offered Gola, Gollop, and Kabacinski lucrative jobs in exchange for approving and executing the Omnibus Agreement.  And, Miles, Petch, and John Does 1-75 were incentivized to participate in and further the conspiracy because SeeCubic would obtain and control Stream TV's valuable assets from which SeeCubic's shareholders could profit, and all Defendants, including Miles, Petch, and John Does 1-75, were given shares of SeeCubic.

112.    Once the Omnibus Agreement was signed, Defendants caused the transfer of Stream TV's assets to SeeCubic.  Defendants therefore unlawfully stole Stream TV's assets.

113.    The conspiracy benefitted Defendants and harmed Stream TV in that Stream TV was wrongfully deprived of its valuable assets, some of which were destroyed, and Defendants benefited from their misconduct due to their ownership of stock in SeeCubic, which received Stream TV's valuable assets, and correspondingly increased SeeCubic's own value.

114.    Defendants acted together as a confederation and committed the unlawful acts described herein, which caused damage to Stream TV by forcing Stream TV into default and depriving Stream TV of its valuable assets.

### Count III—Unjust Enrichment (All Defendants)

115.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

116.    Defendants have been enriched by their illegal takeover and control of Stream TV and its assets.

117.    Stream TV has been impoverished by Defendants' actions.

118.    There is a relationship between the enrichment and the impoverishment because Defendants were unjustly enriched by exerting control over Stream TV to force it into default, to manufacture a basis for the Omnibus Agreement, so that Defendants could unlawfully obtain Stream TV's valuable assets to the detriment of Stream TV.

119.    Defendants lack any justification in taking control over Stream TV and its assets.

### Count IV—Breach of Fiduciary Duty (Against Gola and Gollop)

120.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

121.    As directors of Stream TV both before and after the Omnibus Agreement was executed, Gola and Gollop owed Stream TV the fiduciary duty of loyalty, which obligates them to act in good faith in the best interests of Stream TV.

122.     In approving the Omnibus Agreement, Gola and Gollop stood on both sides of the transaction because they stood to profit personally from it as they would become directors and stockholders of SeeCubic if the Omnibus Agreement succeeded.  Gola's and Gollop's decision to use the Omnibus Agreement to divert Stream TV's assets to SeeCubic, an entity they and other Defendants control, demonstrates a lack of good faith.

123.     As alleged herein, Gola and Gollop engaged in an opportunistic and disloyal scheme to profit personally by approving the Omnibus Agreement to allow Defendants, including themselves, to steal from Stream TV.  Further, they did so without seeking third-party legal advice on a significant transaction affecting hundreds of shareholders and millions of dollars in assets.

124.     Gola and Gollop put their personal interests above the interests of Stream TV by devising, structuring, and approving the Omnibus Agreement, which was designed to allow Gola and Gollop, and the other Defendants to capitalize and profit from Stream TV's valuable assets.  This was a disloyal and bad faith act undertaken for no legitimate business purpose and in direct contravention of Gola's and Gollop's fiduciary duties under Delaware law.

125.     Based on the foregoing, Gola and Gollop breached their fiduciary duties.

**Count V—Aiding and Abetting Breach of Fiduciary Duty (Against Stastney, Crawford, Miles, Petch, John Does 1-75)**

126.     Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

127.     Defendants Stastney, Crawford, Miles, Petch, and John Does 1-75 aided and abetted breaches of fiduciary duty by Gola and Gollop.

128.     Upon information and belief, Defendants Stastney, Crawford, Miles, Petch, and John Does 1-75 knew that Gola and Gollop were on Stream TV's Board and that Gola and Gollop

owned fiduciary duties to Stream TV, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties.

129.    Defendants Stastney, Crawford, Miles, Petch, and John Does 1-75 acted with knowledge of Gola's and Gollop's breaches of fiduciary duty to Stream TV and actively participated in those breaches of fiduciary duty by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in SeeCubic in return for their actions (at least because Stastney and Crawford had offered Gola and Gollop these benefits).

130.    Defendants Stastney, Crawford, Miles, Petch, and John Does 1-75 knowingly aided and abetted the Gola's and Gollop's wrongdoing alleged herein and rendered substantial assistance to them.

131.    As a result of this conduct, Stream TV has been harmed.

**Count VI—Tortious Interference With Prospective Economic Advantage (Against All Defendants)**

132.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

133.    Plaintiff had an economic relationship with Alphabet and Google, with the probability of entering into an agreement for Plaintiff to provide technology to Alphabet and Google.

134.    Defendants were aware of Plaintiff's relationship with Alphabet and the anticipated business relationship that would result.  Defendants took intentional actions that were designed to interfere with and disrupt the Alphabet relationship, including manufacturing Stream TV's default and creating the Omnibus Agreement as a way to convert and appropriate Stream TV's assets.

24

135.    Defendants' interference was wrongful in that, among other things, it involved: (i) a breach of fiduciary duty by Gola and Gollop, (ii) conversion of Stream TV's assets, and (iii) conspiracy to steal and divert Stream TV's assets to SeeCubic.

136.    Defendants' interference with the Alphabet relationship disrupted Stream TV's relationship and opportunity with Alphabet, which has caused harm to Plaintiff because as a direct and proximate result of that interference, Plaintiff was unable to pursue a deal with Alphabet further.  Plaintiff has and will continue to suffer monetary damages in an amount to be determined at trial.

### Count VII—Civil RICO (Against All Defendants)

137.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

138.    As described above, Defendants directed the conduct of their enterprise to illegally take possession of Stream TV's assets and intellectual property.

139.    Defendants took over Stream TV through a pattern of bribery and threats of financial loss.

140.    Defendants' unlawful conversion of Stream TV's assets and intellectual property deprived Stream TV of its assets and intellectual property, causing injury to Stream TV.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks the Court to enter an order:

A.      Directing Defendants to return Stream TV's assets that they have in their possession, custody, or control that the Defendants removed from Stream TV.

B.      Awarding Stream TV damages for conversion, civil conspiracy, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with

ME1 41178620v.1

prospective economic advantage, and violations of the civil RICO statute, including treble damages, in an amount to be proved at trial.

C.      Awarding Stream TV its costs and expenses, including reasonable attorneys' fees and costs, incurred in this action;

D.      Awarding Stream TV pre- and post-judgment interest; and

E.      Granting such other and further relief that this Court deems just, proper and equitable.

Dated:  June 22, 2022                     **McCARTER & ENGLISH, LLP**

*/s/ Brian R. Lemon*
Andrew S. Dupre (No. 4621)
Brian R. Lemon (No. 4730)
Stephanie Dallaire (No. 5184)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Tel.: (302) 984-6300

*Attorneys for Plaintiff*

26

# EXHIBIT A

# THIS DOCUMENT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

# THIS DOCUMENT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT C

# THIS DOCUMENT HAS BEEN REDACTED IN ITS ENTIRETY