## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-851-CJB |
| | ) | |
| SHADRON STASTNEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS ALASTAIR CRAWFORD, ASAF GOLA, PATRICK MILES, ARTHUR LEONARD ROBERT MORTON, ROBERT PETCH, SHADRON STASTNEY, AND HAWK INVESTMENT HOLDINGS LIMITED'S JOINT MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR THE FAILURE TO STATE A CLAIM**

Dated: March 13, 2023

OF COUNSEL:

Terence M. Grugan (*pro hac vice*)
Emilia L. McKee Vassallo (*pro hac vice*)
Izabella Babchinetskaya (*pro hac vice to be filed*)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Grugant@ballardspahr.com
McKeeVassalloe@ballardspahr.com
Babchinetskayai@ballardspahr.com

Tyler B. Burns (No. 6978)
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Burnst@ballardspahr.com

*Counsel for Alastair Crawford, Patrick Miles, Robert Petch, and Shadron Stastney*

OF COUNSEL:

David M. Laigaie (*pro hac vice*)
Eli Granek (*pro hac vice*)
Shari Parker (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT,
LLC
Two Liberty Place, Fl 22
50 S. 16th Street
Philadelphia, PA 19102
P: (215) 851-8400
dlaigaie@eckertseamans.com
egranek@eckertseamans.com
sparker@eckertseamans.com


OF COUNSEL:

Thomas A. Warns (*pro hac vice)*
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-4009
tom.warns@klgates.com

Alexandra D. Rogin (No. 6197)
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
222 Delaware Avenue, Suite 700
Wilmington, DE 19801
Tel: (305) 552-2935
arogin@eckertseamans.com

*Attorneys for Asaf Gola*


Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

*Attorneys for Hawk Investment Holdings
Limited and Arthur Leonard Robert
Morton*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.............................. 1

SUMMARY OF ARGUMENT ................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 4

    A.      Stream ............................................................................................................... 4

    B.      Stream's Financial Difficulties ...................................................................... 5

    C.      The Omnibus Agreement ............................................................................... 6

    D.      The Chaos of Litigation ................................................................................. 7

            1.      The Omnibus Action ......................................................................... 7

            2.      The Bankruptcy Action ..................................................................... 8

            3.      The Pennsylvania Actions .................................................................. 9

            4.      The Delaware Supreme Court ........................................................... 10

            5.      The Court of Chancery §225 Action ................................................. 11

            6.      The Instant Case ............................................................................... 12

ARGUMENT ........................................................................................................................ 13

    A.      Rule 12(b)(6) Standard ................................................................................. 13

    B.      Collateral Estoppel Bars Stream's Claims. ................................................. 13

    C.      The Injunction Bond Rule Precludes this Litigation. ................................. 16

    D.      Stream's Certificate Proscribes Bringing this Action in this Court. ................ 18

    E.      Stream Fails to State a Claim for Conversion (Count I). ....................................... 18

    F.      Stream Fails to State a Claim for Civil Conspiracy (Count II). ............................ 21

    G.      Stream Fails to State a Claim for Unjust Enrichment (Count III). ....................... 22

    H.      Stream Fails to State a Claim for Breach of Fiduciary Duty (Count IV). ............ 23

    I.      Stream Fails to State a Claim for Aiding and Abetting a Breach of Fiduciary Duty (Count V). ...................................................................... 26

    J.      Stream Fails to State a Claim for Tortious Interference (Count VI). .................... 27

    K.      Stream Fails to State a Claim for Civil RICO (Count VII). ................................ 29

CONCLUSION ................................................................................................................... 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Air Prods. & Chems., Inc. v. Wiesemann*,
   237 F. Supp. 3d 192 (D. Del. 2017)......................................................23

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*,
   910 A.2d 1020 (Del. Ch. 2006)............................................................22

*Am. Inst. for Chartered Prop. Cas. Underwriters v. Potter*,
   2021 U.S. Dist. LEXIS 22907 (D. Del. Feb. 8, 2021)........................29

*Angelico v. Lehigh Valley Hosp., Inc.*,
   184 F.3d 268 (3d Cir. 1999).................................................................13

*Arch Ins. Co. v. Murdock*,
   2018 Del. Super. LEXIS 96 (Del. Super. Mar. 1, 2018).....................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................13

*Atl. NWI, LLC v. Carlyle Grp. Inc.*,
   2022 Del. Ch. LEXIS 303 (Del. Ch. Oct. 28, 2022)...........................27

*Bass v. First Pac. Networks, Inc.*,
   219 F.3d 1052 (9th Cir. 2000) .............................................................17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................13

*In re BJ's Wholesale Club, Inc. S'holders Litig.*,
   2013 Del. Ch. LEXIS 28 (Del. Ch. Jan. 31, 2013) ........................24, 26

*Briddel v. Hanuschak*,
   2015 Del. Ch. LEXIS 161 (Del. Ch. June 12, 2015) ..........................16

*Caro v. Fidelity Brokerage Serv.*,
   2015 U.S. Dist. LEXIS 57116 (D. Conn. Apr. 30, 2015)....................20

*City of Newark v. Unemployment Ins. Appeal Bd.*,
   802 A.2d 318 (Del. Super. 2002).........................................................15

*Columbia Cas. Co. v. Playtex FP, Inc.*,
   584 A.2d 1214 (Del. 1991) ..................................................................14

*Concerned Citizens of the Estates of Fairway Village v. Fairway Cap, LLC*,
  256 A.3d 737 (Del. 2021) ................................................................................16, 17

*Concur-Texas, LP v. Duradril, LLC*,
  2016 U.S. Dist. LEXIS 60258 (D. Utah. May 5, 2016)........................................20

*In re Crimson Expl. Inc. S'holder Litig.*,
  2014 Del. Ch. LEXIS 213 (Del. Ch. Oct. 24, 2014) ............................................26

*In re Direct Response Media, Inc.*,
  466 B.R. 626 (Bankr. D. Del. 2012) ...............................................................23, 29

*Dodson Aviation, Inc. v. Padron*,
  2011 U.S. Dist. LEXIS 29263 (D. Kan. Mar. 22, 2011).......................................21

*Don Post Studios, Inc. v. Cinema Secrets, Inc.*,
  148 F. Supp. 2d 572 (E.D. Pa. 2001) ...................................................................17

*Drug, Inc. v. Hunt*,
  8 A. 87 (Del. 1933) ...............................................................................................18

*Germinaro v. Fidelity Nat'l Title Ins. Co.*,
  737 F. App'x 96 (3d Cir. 2018) ......................................................................29, 30

*Gurnstein v. Silva*,
  2009 Del. Ch. LEXIS 206 (Del. Ch. Dec. 8, 2009) .............................................19

*Guzzetta v. Serv. Corp. of Westover Hills*,
  7 A.3d 467 (Del. 2010) ....................................................................................17, 18

*Hawk Inv. Holdings, Ltd. v. Stream TV Networks, Inc.*,
  2022 Del. Ch. LEXIS 343 (Del. Ch. Nov. 29, 2022)..................................... *passim*

*Huebner v. All. Fund Servs., Inc.*,
  1999 U.S. Dist. LEXIS 7465 (D.N.J. May 3, 1999) .............................................21

*Hydrogen Master Rights, Ltd. v. Weston*,
  228 F. Supp. 3d 320 (D. Del. 2017).....................................................................23

*James v. City of Wilkes-Barre*,
  700 F.3d 675 (3d Cir. 2012)..................................................................................13

*Jing Jing v. Weyland Tech, Inc.*,
  2017 U.S. Dist. LEXIS 91973 (D. Del. June 15, 2017)........................................19

*Krim v. ProNet, Inc.*,
  744 A.2d 523 (Del. Ch. 1999)...............................................................................25

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. Apr. 15, 2009) ...................................................................22

*LabMD Inc. v. Boback*,
    47 F.4th 164 (3d Cir. 2022) ....................................................................................29

*LaPoint v. AmerisourceBergen Corp.*,
    970 A.2d 185 (Del. 2009) ........................................................................................15

*Leonard v. Stemtech Int'l*,
    2012 U.S. Dist. LEXIS 120525 (D. Del. Aug. 24, 2012) .........................................4

*Macrophage Therapeutics, Inc. v. Goldberg*,
    2021 Del. Ch. LEXIS 127 (Del. Ch. June 23, 2021) ........................................18, 21

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ......................................................................................26

*Markusic v. Blum*,
    2020 Del. Ch. LEXIS 267 (Del. Ch. Aug. 18, 2020)..............................................28

*In re MeadWestvaco S'holders Litig.*,
    168 A.3d 675 (Del. Ch. 2017)..................................................................................24

*Milan Express, Inc. v. Averitt Express, Inc.*,
    208 F.3d 975 (11th Cir. 2000) .................................................................................17

*Morgan v. Cash*,
    2010 Del. Ch. LEXIS 148 (Del. Ch. July 16, 2010)................................................26

*Murphy Marin Servs. of Del. v. GT USA Wilmington, LLC*,
    2019 Del. Ch. LEXIS 297 (Del. Ch. Aug. 8, 2019)................................................17

*Nemec v. Shrader*,
    2009 Del. Ch. LEXIS 67 (Del. Ch. Apr. 30, 2009) ................................................23

*Ocimum Biosolutions (India) Ltd. v. LG Corp.*,
    2021 U.S. Dist. LEXIS 45742 (D. Del. Mar. 11, 2021) .........................................21

*Organovo Holdings, Inc. v. Dimitrov*,
    162 A.3d 1023 (Del. Ch. 2017)................................................................................27

*In re Pattern Energy Grp. Inc. Sec. Litig.*,
    2022 U.S. Dist. LEXIS 14859 (D. Del. Jan. 27, 2022)...........................................18

*Ridel v. ICI Ams. Inc.*
    968 A.2d 17 (Del. 2009) ..........................................................................................19

*Sec'y United States Dep't of Lab. v. Kwasny*,
    853 F.3d 87 (3d Cir. 2007)......................................................................................14

*SphereCommerce, LLC v. Caulfield*,
    2022 Del. Ch. LEXIS 27 (Del. Ch. Feb. 3, 2022)................................................22

*Sprint Commc'ns Co. v. CAT Commc'ns Int'l. Inc.*,
    335 F.3d 235 (3d Cir. 2003)........................................................................16, 17, 18

*Stone & Paper Invs., LLC v. Blanch*,
    2020 Del. Ch. LEXIS 225 (Del. Ch. June 29, 2020) ..........................................18

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    2021 Del. Ch. LEXIS 284 (Del. Ch. Dec. 2, 2021) ..............................................9

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    250 A.3d 1016 (Del. Ch. 2020)...................................................................... *passim*

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    279 A.3d 323 (Del. 2022) ...................................................................................5, 10

*T-Jat Sys. 2006 v. Expedia, Inc.*,
    2017 U.S. Dist. LEXIS 31714 (D. Del. Mar. 7, 2017) ........................................21

*Touch of It. Salumeria & Pasticceria, LLC v. Bascio*,
    2014 Del. Ch. LEXIS 2 (Del. Ch. Jan. 13, 2014) ................................................19

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013).....................................................................................25

*In re Transkaryotic Therapies, Inc.*,
    954 A.2d 346 (Del. Ch. 2008).................................................................................25

*Truinject Corp. v. Galderma, S.A.*,
    2020 U.S. Dist. LEXIS 156255 (D. Del. Aug. 28, 2020) .....................................28

*Truinject Corp. v. Nestle Skin Health, S.A.*,
    2020 U.S. Dist. LEXIS 2541 (D. Del. Jan. 7, 2020).............................................27

*Tullock v. Mulvane*,
    184 U.S. 497 (1902)................................................................................................17

*United States v. Bergrin*,
    650 F.3d 257 (3d Cir. 2011)....................................................................................29

*Vichi v. Koninklijke Philips Elecs. N.V.*,
    62 A.3d 26 (Del. Ch. 2012)....................................................................................17

*In re Wash. Mut. Inc.*,
    741 F. App'x 88 (3d Cir. 2018) ..............................................................13

*WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*,
    49 A.3d 1168 (2012) ...............................................................28, 29

**Statutes**

6 *Del. C.* §9-609 (a)(1) ...........................................................................19

8 *Del. C.* §115 ....................................................................................18

8 *Del. C.* §225 ....................................................................................11

11 U.S.C. §1112(b) ................................................................................8

**Other Authorities**

Ct. Ch. R. 65.1 ..............................................................................16, 17

Federal Rule of Civil Procedure 12(b)(6) ..............................................1, 13

Restatement (Second) of Torts §266 ..........................................................19

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

This "tort damages case" stems from Plaintiff Stream TV Network, Inc.'s ("Stream") out-of-court restructuring after it defaulted on its obligations under certain loan agreements with Defendant Hawk Investment Holdings Limited ("Hawk") and non-party SLS Holdings VI, LLC ("SLS"). This is the fourth proceeding filed by Stream and its principals, Mathu and Raja Rajan (the "Rajans"), arising from the same operative facts, and alleging many of the same claims against the same defendants or associated persons/entities. *Mathu Rajan v. Crawford*, No. 21-1456 (E.D. Pa. 2021) (the "Mathu Action"); *Raja Rajan v, Crawford*, No. 210200269 (Pa. Ct. Com. Pl., Phila. Cnty. 2021); *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch.) (the "Omnibus Action").

On June 22, 2022, Stream filed its initial Complaint against, among others, Defendants Shadron Stastney, Alastair Crawford, Patrick Miles, Robert Petch, and Asaf Gola. D.I. 1. Stream filed a First Amended Complaint on July 28, 2022, adding Defendants Robert Morton and Hawk (together with the prior Defendants, the "Moving Defendants"). D.I. 9. The Moving Defendants filed a motion to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) on January 13, 2023. D.I. 38. In lieu of responding to that motion, Stream once more amended its complaint, filing the Second Amended Complaint on February 13, 2023 (the "SAC"). D.I. 54. Although the Court has entered a Scheduling Order, D.I. 62, a scheduling conference is not yet scheduled. Because the SAC still fails to address the defects plaguing Stream's last two attempts to adequately plead a legally viable claim, the Moving Defendants once again move to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## SUMMARY OF ARGUMENT

Stream's SAC exposes Stream's purpose for filing this suit: to find a friendlier jurisdiction that will help it avoid adverse rulings already issued against it in the Delaware Court of Chancery.

Like its previous iterations, the SAC fails to disclose that another court has conclusively determined Stream committed multiple events of default under notes memorializing loans between Stream and its senior and junior secured lenders, SLS and Hawk, respectively.  Nor does the SAC disclose that, after Stream and its creditors entered into a non-litigation settlement of those defaults through an "Omnibus Agreement," Stream, through the Rajans, have engaged in what the Court of Chancery has described as "litigation chaos" to prevent its creditors from executing on the collateral underlying those loans, *i.e.*, Stream's business assets.  Stream's gambits to date have included multiple litigations in the Court of Chancery, a bankruptcy filed in this district (dismissed as filed in bad faith), and multiple litigations in the Pennsylvania state and federal courts.

Relying on the Delaware Supreme Court's limited ruling that the Omnibus Agreement is procedurally invalid, Stream seeks to bring its litigation chaos to this Court.  Once again, it presses debunked claims of conspiracy and illegality in the events leading up to the execution of the Omnibus Agreement – claims the Court of Chancery has rejected multiple times.  And once again, Stream is pursuing this duplicative suit while embroiled in overlapping litigation pending in the Court of Chancery without regard for the Court's or the parties' time and resources.  Regardless, as with the First Amended Complaint, Stream's claims fail as a matter of law because the SAC fails to plead any new facts to support Stream's claims.

First, collateral estoppel still bars Stream's claims.  Indeed, since Stream filed this suit, the Court of Chancery ruled that allegations identical to those Stream asserts here are precluded by prior rulings in the Omnibus Action.  As the Court of Chancery recently reiterated:

> Evidencing its wily way with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020."  Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage."  That is another way of contending that a default never really occurred.  If Stream wanted to advance that

argument, it had to do so in the Omnibus Agreement Litigation.  Collateral estoppel bars Stream from advancing that argument now.

*Hawk Inv. Holdings, Ltd. v. Stream TV Networks, Inc.*, 2022 Del. Ch. LEXIS 343, *45-46 (Del. Ch. Nov. 29, 2022).  This action will be the second time Stream's claims will have been barred by collateral estoppel in Delaware with the Pennsylvania actions likely to be the third and fourth.[1]

Second, the injunction bond rule bars Stream's claims.  If Stream believed it suffered harm from the Court of Chancery's preliminary injunction order, which enforced the Omnibus Agreement and allowed SeeCubic, Inc. ("SeeCubic") to possess Stream's assets, Stream was required to seek recourse against the $1 million bond SeeCubic posted.

Third, Stream's Third Amended and Restated Certificate of Incorporation ("Certificate") provides a mandatory forum-selection clause, providing the Court of Chancery "shall be the sole and exclusive forum for … any action asserting a claim of breach of fiduciary duty owed by any director … to the Company or the Company's shareholders."  SAC, Ex. B §V(D).  Because Stream is "asserting a claim of breach of fiduciary duty" by Stream's former directors, the Certificate requires this action be brought in the Court of Chancery.

Finally, should the Court reach the substance of Stream's claims, it will find them utterly without merit as a matter of law.  Stream's claim for conversion fails as the actions taken to possess the property – after Stream defaulted on its loans with SLS and Hawk – were all pursuant to a valid court order.  None of the new facts in the SAC change this fact.  Because the conversion claim fails, so too does Stream's pendent civil conspiracy claim.  Further, the unjust enrichment claim is premised on the secured creditors' rights pursuant to a contract and thus barred.  Likewise, Stream has failed to adequately plead its claim of breach of fiduciary duty as the SAC is devoid of facts

---

[1] On January 1, 2023, the Mathu Action was stayed pending the outcome of the 225 Action and the Omnibus Action.  Jan. 1, 2023 Order (Mathu Action D.I. 57).

sufficient to overcome the business-judgment rule or the Certificate's exculpatory clause, relying instead upon conclusory allegations insufficient to meet Stream's burden.  As a result, Stream's aiding and abetting claim too fails.  Moreover, Stream's tortious interference claim fails because the SAC still fails to allege a bona fide expectancy of a contractual relationship with a third-party.  Lastly, Stream's RICO claim again fails as the SAC does not allege new facts to establish a pattern of activity over the requisite period.  As such, each claim must be dismissed.

## STATEMENT OF FACTS

### A.     Stream

Stream was founded in 2009 to develop technology allowing consumers to view three-dimensional content on their displays without the use of 3D glasses.[2]  SAC ¶¶11, 38.  Between 2009 and 2020, Stream raised approximately $160 million through equity investments, debt, and direct loans.  SAC ¶38.  Relevant here, Stream borrowed $6 million from SLS (the "SLS Notes"), and over £50 million and additional millions denominated in dollars from Hawk (the "Hawk Notes").  SAC ¶¶49-50.  As collateral for these loans, Stream pledged all of its assets and its wholly owned subsidiaries' assets.  *Id.*  Specifically, the Stream-SLS security agreement (together with the SLS notes, the "SLS Loan Documents") authorizes SLS to take control of Stream's assets in the event of its default, SAC ¶49; *PI Op.*, 250 A.3d at 1023, while the Hawk loan documents (i) authorized Hawk to levy on and take control of Stream's assets to satisfy the Hawk Notes if

---

[2] While Stream has received significant injections of capital since 2009, it has not developed a product and "remains a pre-revenue, development stage company."  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "PI Opinion" or "PI Op.").  The PI Opinion and others cited in this section are cognizable at the motion to dismiss stage as they are subject to judicial notice, underpin Moving Defendants' collateral estoppel argument, and as the Court of Chancery found, bind Stream.  *Leonard v. Stemtech Int'l*, 2012 U.S. Dist. LEXIS 120525, at *11 n.6 (D. Del. Aug. 24, 2012) (collecting cases).

Stream defaulted, and (ii) provided that, if Stream defaulted under any of the Hawk Notes, then Hawk could vote Stream's shares.  SAC ¶50; *PI Op.*, 250 A.3d at 1023.

## B.    Stream's Financial Difficulties

By 2019, Stream was insolvent.  In addition to its debts to its secured creditors, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers.  *PI Op.*, 250 A.3d at 1024.  Stream also failed to make the payments necessary to maintain the patents on its technology – its most significant asset and the key to its potential success.  *Id.*  In January 2020, Stream missed payroll.  *Id.*  In February 2020, Stream was able to make payroll only due to an emergency capital infusion from Hawk and another investor and by furloughing employees.  *Id.*

Amidst these difficulties, Crawford and certain other equity investors (the "Equity Investors") engaged in discussions with the Rajans about restructuring Stream.  *Id.*  These discussions involved a proposal to form a "NewCo" that would acquire Stream's assets and "have a more transparent and investor friendly governance structure."  *Id.*  However, those discussions quickly broke down.  *Id.*  On January 3, 2020, the Equity Investors filed a lawsuit in the Delaware Court of Chancery against Stream alleging the Rajans and other corporate insiders committed fraud and breached their fiduciary duties.[3]

By the end of February 2020, Stream had defaulted on its obligations under the SLS Loan Documents and Hawk Notes by, among other things, failing to make payments when due on or about February 1, 2020.  SAC ¶67; *PI Op.*, 250 A.3d at 1024; *Del. Sup. Op.*,[4] 279 A.3d at 327.  SLS provided written notice of the defaults to Stream on or about March 9, 2020.  *PI Op.*, 250

---

[3] Verified Compl. (D.I. 1), *Crawford v. Rajan*, C.A. No. 2020-0004-JTL (Del. Ch. 2020).

[4] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Delaware Supreme Court Opinion" or "Del. Sup. Op.").

A.3d at 1024.   On March 23, 2020, SLS commenced a breach of contract and replevin action against Stream in the Delaware Superior Court.[5]

In light of Stream's continuing financial difficulties and in an effort to achieve a non-litigation settlement of Stream's defaults, Stream's investors and secured creditors, including the Equity Investors, Hawk, and SLS, attempted to renew discussions with Stream about restructuring Stream into a new entity with updated governance arrangements.   *Id.*

## C.      The Omnibus Agreement

As part of the restructuring discussions, the Rajans agreed to appoint four outside directors to Stream's Board of Directors (the "Stream Board") including Asaf Gola and Kevin Gollop (the "Outside Directors"), who were formally added pursuant to a written consent the Rajans executed on March 12, 2020.   SAC ¶70; *PI Op.*, 250 A.3d at 1024.   "None of the Outside Directors had prior ties to the Rajans, SLS, or Hawk."   *PI Op.*, 250 A.3d at 1024.

Beginning the following month, the Outside Directors resumed negotiations about restructuring Stream to resolve the outstanding financial issues with Stream's secured creditors and the Equity Investors.   *Id.*   On May 4, 2020, the Stream Board voted to form a Resolution Committee, vested with "the full power and authority of the full Board of Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."   SAC ¶71; *PI Op.*, 250 A.3d at 1025.   The Resolution Committee consisted of Gola and Gollop.   SAC ¶77, *PI Op.*, 250 A.3d at 1025.   On May 6, 2020, the Resolution Committee approved the Omnibus Agreement, binding Stream to comply with its

---

[5] *SLS Holdings VI, LLC v. Stream TV Networks, Inc., et al.*, C.A.. N20C-03-225 MJ CCLD (Del. Super. Mar. 23, 2020).

terms.  SAC ¶77; *PI Op.*, 250 A.3d at 1025.  The signatories to the Omnibus Agreement were Stream, SLS, Hawk, and the Equity Investors.  SAC ¶79; *PI Op.*, 250 A.3d at 1025.

Under the Omnibus Agreement, SLS and Hawk would accept Stream's assets in satisfaction of its outstanding debts, which would be transferred to SeeCubic, a new entity SLS and Hawk controlled.  SAC ¶77; *PI Op.*, 250 A.3d at 1025.  Stream's Class A common stockholders, other than the Rajans, obtained the right to convert their shares to shares of SeeCubic's common stock.  SAC ¶82; *PI Op.*, 250 A.3d at 1025.  The Omnibus Agreement further provided that Stream would receive one million shares of SeeCubic Class A common stock, and, because the Rajans held an ownership interest in Stream, they would benefit from Stream's interest in SeeCubic.  SAC ¶82; *PI Op.*, 250 A.3d at 1025.  As the Court of Chancery held: "[w]ithout the Omnibus Agreement, Stream's creditors would have foreclosed on Stream's assets, leaving its equity investors with nothing.  Or Stream would have filed for bankruptcy, and its equity investors likely would have been wiped out."  *PI Op.*, 250 A.3d at 1025-26.

## D.     The Chaos of Litigation

Following a series of failed attempts to undermine and terminate the Omnibus Agreement, *id.* at 1026, the Rajans acting individually and through Stream, both with the assistance of counsel and *pro se*, embarked on a strategy of creating widespread "litigation chaos."

### 1.     The Omnibus Action

On September 8, 2020, Stream initiated the Omnibus Action in the Delaware Court of Chancery, seeking a temporary restraining order barring SeeCubic from enforcing the Omnibus Agreement.  *Id.* at 2017; SAC ¶110.  SeeCubic filed counterclaims and third-party claims against the Rajans and moved for its own temporary restraining order.  *PI Op.*, 250 A.3d at 2017.  After significant discovery, the Court of Chancery granted SeeCubic's motion and denied Stream's.  In the PI Opinion, the Court of Chancery found the Omnibus Agreement valid and binding, and issued

a preliminary injunction "preventing Stream or any of the third-party defendants from taking any action to interfere with it." *PI Op.*, 250 A.3d at 1022. SeeCubic posted a $1 million bond as security, SeeCubic's Notice of Lodging Bond (Omnibus Action D.I. 113), and later moved for summary judgment to convert the preliminary injunction into a permanent injunction.

    2.   <u>The Bankruptcy Action</u>

Before the Court of Chancery could rule on the summary judgment motion, , the Rajans caused Stream to file for bankruptcy in the United States Bankruptcy Court for the District of Delaware on February 24, 2021.[6] Filing for bankruptcy constituted an independent event of default under the Hawk Notes. On May 17, 2021, the Bankruptcy Court dismissed Stream's Chapter 11 bankruptcy case for cause under 11 U.S.C. §1112(b) for failure to file a bankruptcy case in good faith, describing it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor …."[7]

After the bankruptcy stay lifted, the Court of Chancery rejected the Rajans' efforts to nullify the PI Opinion, granted summary judgment for SeeCubic, and entered the Permanent

---

[6] Chapter 11 Voluntary Pet. (D.I. 1), *In re Stream TV Networks, Inc.*, Bankr. No. 21-10433, (Bankr. D. Del. Feb. 24, 2021).

[7] May 17, 2022 Tr. (Bankr. D.I. 200), 13:20-14:1. On December 16, 2021, the Delaware District Court entered an order affirming the bankruptcy court's decision. Dec. 16, 2021 Oder (D.I. 32)*, In re Stream TV Networks*, Bankr. App. No. 21-28, Civil No. 21-723 (D. Del.). On May 21, 2021, an involuntary bankruptcy petition for Chapter 7 relief was filed for Stream. Bankr. Pet. (D.I. 1), *In re Stream*, Bankr. No. 21-10848 (Bankr. D. Del. May 21, 2021). On June 10, 2021, the bankruptcy court dismissed the case, entering an order granting the emergency motion for SeeCubic, Inc. and SLS Holdings VI, LLC dismissing the involuntary case, with prejudice, prohibiting the commencement of future Chapter 11 or Chapter 7 cases of Stream until one year from the date of the order. June 10, 2021 Order (D.I. 36), *id*. Stream's consent to the involuntary bankruptcy constituted a third default under the Hawk Notes.

Injunction on September 23, 2021.[8]  Later addressing a further motion by the Rajans to modify the Permanent Injunction, the Court of Chancery observed that "[c]reating litigation chaos seemed to be one of the Rajans' strategies."[9]

       3.     The Pennsylvania Actions

Prior to initiating the Omnibus Action, on May 27, 2020, the Rajans filed an action in the Philadelphia Court of Common Pleas against Crawford, alleging defamation, abuse of process, and tortious interference with contract (the "Joint Lawsuit").[10]  The Rajans allowed this action to linger without taking any action, including serving it, for nearly nine months.[11]  Then, ignoring the permanent injunction in the Omnibus Action, on February 3, 2021, Raja Rajan filed a separate but mostly identical lawsuit against Crawford in the Philadelphia Court of Common Pleas (the "Raja Rajan Lawsuit").[12]  The Rajans then reinstituted the Joint Lawsuit and served it on Crawford on February 24, 2021.[13]  After Crawford removed both suits to federal court and moved to dismiss in both cases, the Rajans filed separate but nearly identical amended complaints, continuing to flout the permanent injunction and adding claims against Stastney, Gollop, and Gola.[14]

---

[8] Sept. 23, 2021 Order Granting in Part SeeCubic Inc.'s Mot. for Summ. J. (Omnibus Action D.I. 193).

[9] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 Del. Ch. LEXIS 284, at *5 (Del. Ch. Dec. 2, 2021).

[10] Compl., *Rajan v. Crawford*, Case No. 200501648 (Phila. Ct. Comm. Pl. May 27, 2020).

[11] Rule to Show Cause, *id*. (Feb. 5, 2021).

[12] Compl., *(Raja) Rajan v. Crawford*, Case No. 210200269 (Phila Ct. Comm. Pl. Feb. 3, 2021).

[13] Mot. to Amend, Joint Lawsuit (Mar. 19, 2021).

[14] *Compare* Am. Compl. (Mathu Action D.I. 8) *with* Am. Compl. (D.I. 15), *(Raja) Rajan v. Crawford*, No. 21-1150 (E.D. Pa. Apr. 6, 2021). The Raja Rajan Lawsuit was later remanded to the Philadelphia Court of Common Pleas.  Remand Order (D.I. 54), *(Raja) Rajan v. Crawford*, No. 21-1456, (E.D. Pa.).

Through those lawsuits, the Rajans, in their individual capacities, assert largely the same claims based on the same facts Stream presses here – all of which rely on the conspiratorial gloss the Rajans apply to events surrounding Stream's defaults that the Court of Chancery rejected in binding final orders.  The Raja Rajan Lawsuit and Joint Lawsuit remain pending, awaiting adjudication of defendants' preliminary objections and motion to dismiss, which assert, *inter alia*, that collateral estoppel bars the claims asserted.

### 4.  The Delaware Supreme Court

In the interim, Stream appealed the permanent injunction.  On June 15, 2022, the Delaware Supreme Court vacated the permanent injunction on the discrete procedural ground that certain shareholder approvals were required to effectuate the Omnibus Agreement.  Notably, the Delaware Supreme Court left the Court of Chancery's findings of fact undisturbed and repeated many of them in its opinion. *Del. Sup. Op.*, 279 A.3d at 326 n.2 ("[T]he background facts pertinent to this appeal are drawn primarily from the December 8, 2020 Preliminary Injunction Opinion, the September 23, 2021 Order Granting In Part SeeCubic, Inc.'s Motion for Summary Judgment, the November 10, 2021 Order Entering Partial Final Judgment Under Rule 54(b), and the December 8, 2021 Order Denying Stream's Motion to Modify the Injunction") (internal citations omitted).

On remand, the Court of Chancery entered a second final partial judgment (the "Second Final Judgment") on August 7, 2022, declaring the Omnibus Agreement "without legal effect" but, nevertheless, leaving its prior factual determinations, which the Delaware Supreme Court adopted, undisturbed.[15]   In doing so, the Court of Chancery reaffirmed that Stream's secured creditors retained their rights to Stream's collateral. *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *12-13.  No timely appeal was ever taken from the Second Final Judgment, thus that order became final. *Id.*

---

[15] Second Final Judgment (Omnibus Action D.I. 266).

5.      The Court of Chancery §225 Action.

Afterward, Hawk attempted to exercise its secured creditor rights by replacing the directors of Technovative Media, Inc. ("Technovative"), a wholly-owned subsidiary of Stream, and ordering Technovative to marshal collateral held by Technovative.  SAC ¶¶5-8; *Hawk Inv. Holdings, Ltd. v. Stream TV Networks, Inc.*, C.A. No. 2022-0930-JTL (Del. Ch. 2022).[16]  When Stream and the Rajans refused to comply, Hawk brought suit pursuant to 8 *Del. C.* §225 in the Court of Chancery, seeking declaratory judgment that it had validly reconstituted the board of directors of Stream (the "225 Action").  *Id.*; SAC ¶118.

In the 225 Action, Hawk moved for partial summary judgment, asserting Stream was collaterally estopped from advancing several arguments that were adjudicated adversely to Stream in the Omnibus Action.  On November 29, 2022, the Court of Chancery issued a memorandum opinion granting Hawk's motion for partial summary judgment.[17]  The Court of Chancery found Stream collaterally estopped from relitigating several factual findings the Court made in the Omnibus Action, including "(i) the validity of the debt reflected by the Hawk Notes; (ii) Stream's default on the Hawk Notes; (iii) the validity of Hawk's creditor rights; and (iv) the condition predicate that Stream must satisfy to convert the Hawk Notes into equity."  *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *38.  The Court of Chancery found that "Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement."  *Id.* at *44.

---

[16] Hawk, with SLS's approval and participation, also initiated a sale, pursuant to Article 9 of the U.C.C., of the collateral.

[17] *Hawk Inv. Holdings, Ltd. v. Stream TV Networks, Inc.*, 2022 Del. Ch. LEXIS 343, at *1 (Nov. 29, 2022) (the "Hawk Opinion" or "Hawk Op.").

Rejecting Stream's efforts to continue avoiding the consequences of its default and eviscerating Stream's claims here, the Court of Chancery explicitly ruled that collateral estoppel prevented Stream from arguing that its defaults were "manufactured" through a conspiracy:

> Evidencing its wily ways with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020," Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage." That is another way of contending that a default never really occurred. If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation. Collateral estoppel bars Stream from advancing that argument now.

*Id.* at *45.

6.    The Instant Case

Seemingly emboldened by the Delaware Supreme Court opinion, and ignoring all of the Court of Chancery and Delaware Supreme Court's factual findings in the Omnibus Action, the continued litigation of SLS and Hawk's creditor rights in the Court of Chancery, and the Rajans' multiple other pending duplicative claims in the Pennsylvania state and federal courts, Stream filed the instant lawsuit. Based exclusively on the incorrect supposition that the Delaware Supreme Court opinion somehow rendered all of the events leading up to and following the execution of the Omnibus Agreement "unlawful," "wrongful," and "illegal," Stream filed the instant action on June 22, 2022. D.I. 1. Shortly thereafter, Stream amended its complaint on July 28, 2022. D.I. 9. After several stipulations extending time to respond to the First Amended Complaint and to allow Stream to properly serve the nine individuals and entities named as defendants, the Moving Defendants moved to dismiss the First Amended Complaint on January 13, 2023. D.I. 38, 39, 40. In lieu of responding, Stream amended its complaint on February 13, 2023. D.I. 54. The SAC asserts the seven claims against the Moving Defendants that were asserted in the First Amended Complaint.

12

Notably, in amending the Complaint, Stream adds merely additional conclusory allegations, and fails to add any allegations sufficient to meet Stream's burden to state a claim.

The seven causes of action the SAC attempts to plead are: Conversion (Count I); Civil Conspiracy (Count II); Unjust Enrichment (Count III); Breach of Fiduciary Duty against Gola and Gollop (Count IV); Aiding and Abetting Breach of Fiduciary Duty against Mr. Stastney, Mr. Morton, and Hawk (Count V); Tortious Interference (Count VI); and Civil RICO (Count VII).  As discussed in more detail below, all of Stream's claims in the SAC fail as a matter of law.

## ARGUMENT

### A.      Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.  While the Court "accepts as true all factual assertions," it must "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012).  Likewise, the Court should reject allegations that judicially noticeable facts contradict. *E.g.*, *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 279 n.7 (3d Cir. 1999); *In re Wash. Mut. Inc.*, 741 F. App'x 88, 91 n.3 (3d Cir. 2018).

### B.      Collateral Estoppel Bars Stream's Claims.

Despite amending its complaint a second time, Stream's claims remain premised on the theory that the Moving Defendants engaged in a bribery scheme and conspired "to destroy Stream TV from the inside, to cause default events on certain debt instruments that the conspirators had

acquired, and thereafter to use those manufactured default events as a pretext for the co-conspirators to sign over all assets of Stream TV to a shell company, [SeeCubic], controlled by the conspirators, for zero dollars, through an Omnibus Agreement."  SAC ¶6; *accord id.* ¶¶7-10.  Of course, as the Court of Chancery held, "[t]hat is another way of contending that a default never really occurred," which has already been adjudicated to a final judgment against Stream in the Omnibus Action.  *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *45.  And, as the Court of Chancery already held, "[c]ollateral estoppel bars Stream from advancing that argument now."  *Id.* at *46.

Strikingly, Stream did not even attempt to alter this precluded theory in the SAC – much less attempt to address the Court of Chancery's prior holdings.  Stream's failure is telling and underscores the need for collateral estoppel.  Indeed, Stream's SAC is nothing more than further evidence of its "wily ways" and intent to push its meritless theories without regard for the time and resources of the Court or the parties.  *Hawk Op.,* 2022 Del. Ch. LEXIS 343, at *38.

Delaware law determines the preclusive effect of the prior findings in the Omnibus Action.  *Sec'y United States Dep't of Lab. v. Kwasny*, 853 F.3d 87, 94 (3d Cir. 2007).  Under Delaware law, "the doctrine of collateral estoppel provides repose by preventing the relitigation of an issue previously decided.  In addition, by putting an end to litigation, it conserves judicial resources."  *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *39 (quoting *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991)).  "Where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action."  *Columbia Cas. Co.*, 584 A.2d at 1216.

Collateral estoppel bars re-litigation where: (1) the issue previously decided is identical to the issue at bar; (2) the prior issue was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the

party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *City of Newark v. Unemployment Ins. Appeal Bd.*, 802 A.2d 318, 324 (Del. Super. 2002). Preclusion "extends to all issues which might have been raised and decided in the first suit as well as to all issues that actually were decided." *Hawk Op.*, 2022 Del. Ch. LEXIS 343, *43 (citing *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191-92 (Del. 2009)).

The fundamental premise underlying each of Stream's claims continues to be that Stream's defaults were illegitimate and caused through a conspiracy of purported bribery. SAC ¶¶66-10, 121-29, 132, 138-40, 144-45, 150-51, 154-56. However, the legitimacy of Stream's debt and its defaults under the SLS Loan Documents and Hawk Notes was finally adjudicated in the Omnibus Action and cannot be relitigated here. *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *39-43 (describing Stream's indebtedness and defaults and holding "[e]ach of these issues has been decided against Stream by the Second Partial Final Judgment [thus u]nder principles of collateral estoppel, those rulings bind Stream."). The Court of Chancery further noted that this encompassed Stream's contention that there was "an unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage" – the gravamen of this litigation – as it was "another way of contending that a default never really occurred." *Id.* at *45-46.

Second, the Second Final Partial Judgment is a final decision on the merits. Finality is "neither a precise nor rigid concept," encompassing "any prior adjudication of an issue in another action that is determined to be sufficiently firm." *Arch Ins. Co. v. Murdock*, 2018 Del. Super. LEXIS 96, at *18 (Del. Super. Mar. 1, 2018). The factual findings made at the injunction stage of the Omnibus Action were adopted by the Delaware Supreme Court and later relied upon in entry of the Second Final Judgment. The Second Final Judgment was never appealed and therefore "has become final." *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at *41-43 (citations omitted).

Third, it is incontrovertible that preclusion applies to Stream.  As the Court of Chancery held, Stream's prior litigation efforts in the Omnibus Action bind its future assertions.  *Id.* at *39 (collateral estoppel "bind[s] Stream"); *Briddel v. Hanuschak*, 2015 Del. Ch. LEXIS 161, at *7 (Del. Ch. June 12, 2015) (preclusion applied where plaintiff was the same "in both cases").

Fourth, Stream had a full and fair opportunity to litigate the theory that underlies the claims it now asserts in the Omnibus Action.  Stream's entire theory is that the Moving Defendants engaged in an unlawful conspiracy to artificially manufacture a default on the Hawk Notes through internal sabotage and bribery.  SAC ¶¶6-10, 121-29, 132, 138-40, 144-45, 150-51, 154-56.  As the Court of Chancery explained in the Hawk Opinion, "[i]f Stream wanted to advance th[ese] argument[s], it had to do so in the [Omnibus Action]."  2022 Del. Ch. LEXIS 343, at *45-46. Indeed, Stream had a full and fair opportunity to raise such arguments because it "had every incentive to raise all available challenges to the validity of the [Hawk Notes]."  *Id.*  Yet, Stream failed to do so.  Stream cannot use this forum to take a second bite at the apple.  Collateral estoppel thus bars Stream's claims.  *Id.* at *40-47.

## C.    The Injunction Bond Rule Precludes this Litigation.

Stream's claims remain barred by the injunction bond rule.  Delaware Chancery Rule 65 requires a court issuing an injunction to set a bond.  Ct. Ch. R. 65(c).  This bond requirement: (i) "assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined"; and (ii) provides "the limit of the damages the [enjoined party] can obtain for a wrongful injunction, … provided the plaintiff was acting in good faith."  *Concerned Citizens of the Estates of Fairway Village v. Fairway Cap, LLC*, 256 A.3d 737, 744 (Del. 2021); *Sprint Commc'ns Co. v. CAT Commc'ns Int'l. Inc.*, 335 F.3d 235, 240 (3d Cir. 2003).  Under this limitation known as the "injunction bond rule," *Concerned Citizens*, 256 A.3d at 744; *Sprint Commc'ns Co.*, 335 F.3d at 240, a party's *sole recourse* for harm caused by a

wrongful injunction is against the bond posted, *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 469 (Del. 2010) ("[A] wrongfully enjoined party has no recourse other than … the security," and "recovery is limited to the amount of the bond."); *Sprint Commc'ns Co.*, 335 F.3d at 240.

A wrongfully enjoined party thus must seek recourse for a wrongfully issued injunction against the bond, which it may do by either (i) filing a motion in the original case, or (ii) by filing a separate and independent action against the bond's surety or principal.  Ct. Ch. R. 65.1; *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1054 (9th Cir. 2000); *Milan Express, Inc. v. Averitt Express, Inc.*, 208 F.3d 975, 979-80 (11th Cir. 2000).  Either way, the aggrieved party may not seek recourse from individuals or entities that were not parties to the bond.  *See Don Post Studios, Inc. v. Cinema Secrets, Inc.*, 148 F. Supp. 2d 572, 575 (E.D. Pa. 2001) (quoting *Tullock v. Mulvane*, 184 U.S. 497, 516 (1902) (explaining "an injunction bond 'is in the nature of a contract.'"); *Murphy Marin Servs. of Del. v. GT USA Wilmington, LLC*, 2019 Del. Ch. LEXIS 297, at *5 (Del. Ch. Aug. 8, 2019) ("[A] party cannot be held to a contract without its assent."); *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) ("[A] person not a party to a contract cannot be held liable to it.").

Here, Stream attempts to recast what is a claim for damages against the injunction bond as an independent tort action against those who were *not* parties to the injunction bond.  This is precisely the type of improper action the injunction-bond rule guards against.  *Concerned Citizens*, 256 A.3d at 744.  If Stream wishes to seek damages it purportedly incurred as a result of the Court of Chancery's vacated injunction, it may file a motion in the Omnibus Action or file an independent action against the bond's surety or principal.  Ct. Ch. R. 65.1.  What it cannot do – yet what it seeks to do by bringing this suit – is seek recourse from the Moving Defendants, none

17

of whom were parties to the injunction bond or ever held the property at issue.  *See, e.g.*, *Guzzetta*, 7 A.3d at 469; *Sprint Commc'ns Co.*, 335 F.3d at 240.

### D.       Stream's Certificate Proscribes Bringing this Action in this Court.

Under Stream's Certificate, the Court of Chancery "shall be the sole and exclusive forum for … any action asserting a claim of breach of fiduciary duty owed by any director … to the Company or the Company's shareholders."  SAC, Ex. B §V(D).  The only potential exception to this provision is when "the Company consents in writing to the selection of an alternative forum." *Id.*  Because this is an "action asserting a claim of breach of fiduciary duty" by Stream's former directors, SAC ¶¶128-33, and Stream, rather than a third-party acting with Stream's written consent, unilaterally selected this forum, the Certificate's forum-selection provision requires this action be dismissed.  *E.g.*, *In re Pattern Energy Grp. Inc. Sec. Litig.*, 2022 U.S. Dist. LEXIS 14859, at *29-34 (D. Del. Jan. 27, 2022) (dismissing state-law claims forum-selection clause required be brought in the Court of Chancery), *R & R adopted*, 2022 U.S. Dist. LEXIS 58303 (D. Del. Mar. 30, 2022); *see also* 8 *Del. C.* §115 (authorizing the use of forum-selection provisions in corporate charters to restrict the fora in which actions for a director's breach of a fiduciary duty may be brought).

### E.       Stream Fails to State a Claim for Conversion (Count I).

Under Delaware law, conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."  *Stone & Paper Invs., LLC v. Blanch*, 2020 Del. Ch. LEXIS 225, at *25 (Del. Ch. June 29, 2020) (quoting *Drug, Inc. v. Hunt*, 8 A. 87, 93 (Del. 1933)).  Thus, to establish a claim for conversion, a plaintiff must allege: (1) a "property interest in the converted goods"; (2) "the plaintiff had a right to possession of the goods"; and (3) "that the plaintiff sustained damages."  *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 Del. Ch. LEXIS 127, at *49 (Del. Ch. June 23, 2021) (collecting cases).  To

adequately plead conversion, a party must state "precisely what property the defendant converted, and that [the party's] interest in the property was *viable at the time of the conversion.*"  *Touch of It. Salumeria & Pasticceria, LLC v. Bascio*, 2014 Del. Ch. LEXIS 2, at \*27 (Del. Ch. Jan. 13, 2014) (emphasis added and citation omitted).  Here, Stream's claim for conversion must fail for three reasons.

First, under Delaware law, "[a]fter default, a secured party may take possession of the collateral."  6 *Del. C.* §9-609 (a)(1).  And, a claim for conversion cannot be sustained where the defendant's possession is legal.  *See, e.g.*, *Jing Jing v. Weyland Tech, Inc.*, 2017 U.S. Dist. LEXIS 91973, at \*10 (D. Del. June 15, 2017) (rejecting conversion claim where there was no wrongful act, and defendants were legally justified in their actions).  Thus, because the Court of Chancery has conclusively found that Stream was in default on its loans, Stream lacked a viable interest in the property at issue.  *Hawk Op.*, 2022 Del. Ch. LEXIS 343, at \*40-41 (affirming finding that "'Stream had defaulted on more than $50 million in debt to its secured creditors, owed another $16 million to trade creditors, and could not pay its bills as they came due.'" (quoting *PI Op.*, 250 A.3d at 1020); *see also Hawk Op.*, 2022 Del. Ch. LEXIS 343, at \*45-56 (barring Stream from asserting default never occurred outside of the Omnibus Action).

Second, because SeeCubic acted pursuant to a court order when it took possession of the property, any possession of the property was privileged.  It is axiomatic that the possession of property pursuant to a valid court order does not constitute conversion.  *See* Restatement (Second) of Torts §266[18] ("One is privileged to commit acts which would otherwise be a trespass to a chattel

---

[18] Although the Delaware Supreme Court has not explicitly adopted §266, Delaware courts routinely follow the Restatement (Second) of Torts in various contexts. *E.g.*, *Gurnstein v. Silva*, 2009 Del. Ch. LEXIS 206, at \*61 (Del. Ch. Dec. 8, 2009) ("Delaware generally follows the Restatement with respect to tortious interference."); *Ridel v. ICI Ams. Inc.* 968 A.2d 17, 20 (Del.

or a conversion *when he acts pursuant to a court order which is valid or fair on its face.*" (emphasis added)); *id.* §266 cmt. b (court order is "valid or fair" if: (i) it is "regular in form"; (ii) issued by a court having authority "to issue the particular writ and having jurisdiction over the chattels described in it"; and (iii) "all proceedings required for the proper issuance of the writ have duly taken place").  This rule is widely recognized, and courts across jurisdictions have relied on §266 to find that actions taken pursuant to a court order do not constitute conversion.  *See, e.g. Concur-Texas, LP v. Duradril, LLC*, 2016 U.S. Dist. LEXIS 60258, at *19 (D. Utah. May 5, 2016) (defendant's actions pursuant to a preliminary injunction barred claim for conversion as "a claim of conversion cannot proceed if the defendant has lawful justification for interfering with alleged converted property").

As the Court of Chancery recently reaffirmed, SeeCubic only came into possession of Stream's assets *after* the issuance of the injunction decision.  *Hawk Op.*, 2022 Del. Ch. LEXIS, at *8 ("*After the issuance of the Injunction Decision*, SeeCubic acquired the Legacy Stream Assets [defined as 'all of [Stream's] assets']." (emphasis added)).  SeeCubic then continued to hold the assets pursuant to the Court of Chancery's "First Partial Final Judgment," which upheld the Omnibus Agreement and barred Stream from interfering with it.  *Id.*  Accordingly, because SeeCubic only took possession of Stream's assets after the Court of Chancery granted an injunction, if the Moving Defendants were in possession of Stream's assets, they were privileged to possess Stream's assets and cannot be liable for conversion as a matter of law.  *E.g.*, *Caro v. Fidelity Brokerage Serv.*, 2015 U.S. Dist. LEXIS 57116, at *102 (D. Conn. Apr. 30, 2015) (granting motion to dismiss where defendants acted pursuant to a valid court order to restrain

---

2009) ("[T]o determine whether one party owed another a duty of care, we follow the guidance of the Restatement (Second) of Torts.").

property); *Dodson Aviation, Inc. v. Padron*, 2011 U.S. Dist. LEXIS 29263, at *57-58 (D. Kan. Mar. 22, 2011) (dismissing conversion claim where defendants acquired possession of the property pursuant to an *ex parte* temporary injunction that was later vacated on appeal); *Huebner v. All. Fund Servs., Inc*., 1999 U.S. Dist. LEXIS 7465, at *14 (D.N.J. May 3, 1999) (collecting cases; "[I]t is widely recognized that when a taking is authorized or directed by a court order, conversion will not result").

Third, Stream's conversion claim fails because there are no allegations that any of the Moving Defendants personally obtained control over or possession of the property.  To sustain a claim for conversion, a plaintiff must allege that the defendant had possession or control over the property at issue.  *E.g.¸ Macrophage Therapeutics, Inc.*, 2021 Del. Ch. LEXIS 127, at *51 (granting defendant judgment where the defendant did not have control over and may never have possessed the unidentified property that plaintiff alleged was converted).  The SAC is devoid of any allegations that the Moving Defendants ever possessed the property at issue.[19]  Rather, the SAC alleges *SeeCubic* possessed the property at issue.  SAC ¶123 (alleging that as a result of the Omnibus Agreement the assets were "giv[en] … to SeeCubic").  Therefore, Count I fails.

## F.    Stream Fails to State a Claim for Civil Conspiracy (Count II).

To state a claim for civil conspiracy "a plaintiff must plead facts supporting (i) the existence of a confederation or combination of two or more persons: (ii) that an unlawful act was done in furtherance of the conspiracy; and (iii) that the conspirators caused actual damage to the plaintiff."

---

[19] Stream's conversion claim independently fails because the SAC does not identify conduct attributable to each individual defendant.  Instead, Stream attributes the conversion allegations to "Defendants" as a group.  This form of "group" or "shotgun" pleading fails to satisfy the notice pleading standard.  *E.g.*, *Ocimum Biosolutions (India) Ltd. v. LG Corp.*, 2021 U.S. Dist. LEXIS 45742, at *23 (D. Del. Mar. 11, 2021) (group pleading fails to provide "notice of each defendant's individual conduct"); *T-Jat Sys. 2006 v. Expedia, Inc.*, 2017 U.S. Dist. LEXIS 31714, at *14 (D. Del. Mar. 7, 2017) (explaining allegations lumping multiple defendants together without providing allegations of individual conduct are insufficient to satisfy the notice pleading standard).

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).   "Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. Apr. 15, 2009).  If a plaintiff cannot plead an underlying claim then the civil conspiracy claim must be dismissed.  *Id.*

The SAC still fails to plead an underlying wrong for its civil conspiracy claim for at least two reasons.  First, the alleged wrong underlying Stream's civil conspiracy claim is conversion, but as detailed above, despite amending the complaint Stream has still failed to state a claim for conversion.[20]  *Supra* §E; *Kuroda*, 971 A.2d at 892 ("[I]f plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed.").  Second, Stream again failed to plead the Moving Defendants acted with the requisite scienter because they had the lawful right to possess Stream's assets pursuant to the preliminary injunction order and, therefore, had no reason to believe they were committing a wrongful act.  *See Wayman Fire Prot. v. Premium Fire & Sec., LLC*, 2014 Del. Ch. LEXIS, at *92 (Del. Ch. Mar. 5, 2014) (civil conspiracy is a "scienter-based" doctrine and denying injunction for failure to demonstrate same); *SphereCommerce, LLC v. Caulfield*, 2022 Del. Ch. LEXIS 27, at *19 (Del. Ch. Feb. 3, 2022) ("If the Sphere Parties possessed a right to repurchase, then there was no conversion and no breach of contract.").  The Court therefore should dismiss Count II with prejudice.

### G.    Stream Fails to State a Claim for Unjust Enrichment (Count III).

Stream claims that the Moving Defendants wrongfully manufactured defaults on the SLS Loan Documents and Hawk Notes, which resulted in the transfer of Stream's assets to SeeCubic and an unjust enrichment to the Moving Defendants.  SAC ¶¶132-34.  As with the First Amended Complaint, not only is Stream collaterally estopped from making this argument, but Stream still cannot satisfy the essential elements of an unjust enrichment claim.

---

Establishing a claim for unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy at law." *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 337 (D. Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)). Further, "Delaware courts … have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract." *Air Prods. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 216 (D. Del. 2017) (quoting *Nemec v. Shrader*, 2009 Del. Ch. LEXIS 67, at \*7 (Del. Ch. Apr. 30, 2009), *aff'd*, 991 A.2d 1120 (Del. 2010)).

As discussed above, it has been decided conclusively that the secured creditors had security interests in all of Stream's assets, and Stream defaulted on the notes. *Supra* §B. Stream concedes that the secured creditors had security interests in all of its assets. SAC ¶¶59-60. The fact that the secured creditors' rights to take control of Stream's assets arose under contract is, itself, enough to defeat Stream's claim for unjust enrichment. Stream's claim, however, further fails because the secured creditors here merely exercised their rights in light of Stream's default. This is neither unjust nor an impoverishment, but an exercise of negotiated contractual rights. *In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012) (lender's exercise of its rights under the terms of a loan "is not an impoverishment to the Debtor or any creditor or an unjust enrichment"). These facts are unassailable and fatal to Stream's unjust enrichment claim. The Court therefore should dismiss Count III with prejudice.

### H.    Stream Fails to State a Claim for Breach of Fiduciary Duty (Count IV).[21]

Count IV purports to assert a claim for breach-of-fiduciary duty against Gola and Gollop based on the unsubstantiated theory that they "devis[ed], structur[ed], and approv[ed] the Omnibus

---

[21] Stream asserts Count IV solely against Gola and Gollop.

Agreement" for the purpose of "divert[ing] [Stream's] assets to SeeCubic."  SAC ¶¶138, 140.

Even after a second round of amendments, Stream offers nothing more than bare-bones,

conclusory, and counterfactual assertions to support this cause of action.  This claim, therefore,

should be dismissed.

First, the doctrine of collateral estoppel precludes Stream from maintaining this claim

because the Court of Chancery already ruled – repeatedly – that "Gola and Gollop believed the

Omnibus Agreement to be in the best interests of Stream and its stockholders … because it

prevented Stream's creditors from foreclosing on all of its assets and leaving Stream and its

stockholders with nothing."  *PI Op.*, 250 A.3d at 1046; *accord Hawk Op.*, 2022 Del. Ch. LEXIS

343, at *16 ("[W]ithout the Omnibus Agreement, Stream and its shareholders would have been

left with nothing.").

Second, Stream's Certificate prevents it from maintaining this claim because it expressly

exculpates Gola and Gollop from personal liability for a breach of fiduciary duty, SAC, Ex. B

§V(A) ("[a] director of the Company shall not be personally liable to the Company … for monetary

damages for breach of fiduciary duty as a director"), and the SAC is devoid of facts that show Gola

and Gollop acted in bad faith or were not "both disinterested and independent," *e.g.*, *In re

MeadWestvaco S'holders Litig.*, 168 A.3d 675, 683 (Del. Ch. 2017); *In re BJ's Wholesale Club,

Inc. S'holders Litig.*, 2013 Del. Ch. LEXIS 28, at *20 (Del. Ch. Jan. 31, 2013).

Third, Stream has not pled facts sufficient to show a breach of fiduciary duty.  Stream

admits it was struggling to raise capital, SAC ¶63, "suffer[ing] financial challenges" in early 2022,

*id.* ¶43, battling investor lawsuits, *id.* ¶74, and defaulting on loans secured by all of it and its

subsidiaries' assets, *id.* ¶¶49-50, 75, 81.[22]  These challenges "led to" Stream appointing Gola and

Gollop to serve on its Board as "outside directors."  *Id.* ¶¶70, 75, 20-21.  Gola and Gollop thereafter

negotiated "a reorganization with Stream['s] secured creditors to address Stream['s] financial

difficulties," *id.* ¶71, through which they protected Stream's shareholders' interests by ensuring

the shareholders would be able to exchange their shares in Stream for the equivalent number of

shares in SeeCubic for no cost.  *Id.* ¶¶82, 87, 93; SAC, Ex. A §1.1(d)-(g) (Omnibus Agreement).

As other Delaware courts have found, given these circumstances, there is no reasonable basis to

conclude Gola and Gollop's execution of the Omnibus Agreement lacked a legitimate business

purpose or otherwise somehow breached a fiduciary duty.  *PI Op.*, 250 A.3d at 1022; *see also id.*

at 1045-46.  Just the opposite.

Stream attempts to plead around this fundamental deficiency by alleging in conclusory

fashion that Gola and Gollop stood to benefit from the transaction since they later served on

SeeCubic's Board of Directors and would subsequently obtain shares of SeeCubic.  SAC ¶¶104-

05, 138.  But even if the Court were to credit these allegations, they cannot salvage Stream's

attempt to state a claim for breach of fiduciary duty.  For one thing, such allegations are inadequate

as a director's "post-transaction … board membership [in the surviving entity], standing alone,

would not be sufficient to create a disqualifying interest."  *In re Trados Inc. S'holder Litig.*, 73

A.3d 17, 45 (Del. Ch. 2013); *accord Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999)

(same); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 370 (Del. Ch. 2008) (stating plaintiff's

"unsupported allegations and inferences" were insufficient to support a breach-of-fiduciary claim

where plaintiff claimed a director pushed for a company sale to secure employment with the

---

[22] All of these events predate Gola and Gollop being invited to join Stream's Board, and Gola and Gollop are not, and cannot be, faulted for them.

surviving entity; "[T]he law is clear that outside business ties to an acquirer and interlocking directorships, without more, are insufficient to prove disloyalty") (internal citation omitted).  For another, notwithstanding Stream's conspiratorial gloss, its theory is illogical.  Gola and Gollop already were directors of a company with control over the assets transferred to SeeCubic; transferring those assets to another company in exchange for a role on the new company's board of directors afforded no benefit Gola and Gollop did not already enjoy.[23]

In sum, because this claim is barred by collateral estoppel, *see supra* §B, because this claim is proscribed by Stream's Certificate, *see* SAC, Ex. B §V(A), and because Stream failed to plead facts that show Gola and Gollop acted out of self-interest and in bad faith rather than in the best interest of Stream's shareholders, *e.g.*, *In re Crimson Expl. Inc. S'holder Litig.*, 2014 Del. Ch. LEXIS 213, at *74 (Del. Ch. Oct. 24, 2014); *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 Del. Ch. LEXIS 28, at *19-20, this Count should be dismissed.

## I.      Stream Fails to State a Claim for Aiding and Abetting a Breach of Fiduciary Duty (Count V).

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Morgan v. Cash*, 2010 Del. Ch. LEXIS 148, at *14 (Del. Ch. July 16, 2010) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

The SAC does not add any new facts to support Stream's aiding and abetting claim.  This claim should be dismissed because Stream has failed to allege a breach of fiduciary duty.  *Supra* §H.  Even if Stream could plead a breach of fiduciary duty, the aiding and abetting claim should

---

[23] Unless, of course, escaping Stream's mismanagement and crippling debt was, in fact, a material benefit that increased the value of those assets – a benefit Gola and Gollop successfully obtained for Stream's shareholders despite Stream's dire financial circumstances.

still be dismissed for failure to plead knowing participation on behalf of Mr. Stastney, Mr. Morton, or Hawk (the "Aiding and Abetting Defendants").  Knowing participation requires a pleading of scienter.  *Atl. NWI, LLC v. Carlyle Grp. Inc.*, 2022 Del. Ch. LEXIS 303, at \*16-17 (Del. Ch. Oct. 28, 2022).  "This stringent standard places the burden on plaintiff to plead specific facts from which [the] court could reasonably infer that the defendant had actual or constructive knowledge of their participation in the specified breach." *Id.* (internal quotation omitted).  The SAC has failed to plead facts establishing scienter on the part of the Aiding and Abetting Defendants for the same reasons outlined in response to Stream's civil conspiracy claim.  *Supra* §F.  Count V, therefore, should be dismissed.

### J.      Stream Fails to State a Claim for Tortious Interference (Count VI).

Even if collateral estoppel did not bar Stream from maintaining its claim for tortious interference, this barely developed claim should also be dismissed.  To state a claim for tortious interference with a prospective business relationship, a complaint must plead sufficient facts to show: (i) the reasonable probability of a business opportunity between the plaintiff and a third-party; (ii) the defendant's intentional interference with that opportunity; (iii) proximate causation; and (iv) damages.  *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122-123 (Del. Ch. 2017).  The SAC, like its predecessor, meets none of these elements.

With respect to the first element, the complaint "must establish some basis for a bona fide expectancy of the plaintiff's relationship with a third party," and that "the third party was prepared to enter into a business relationship but was dissuaded from doing so by the defendant." *Truinject Corp. v. Nestle Skin Health, S.A.*, 2020 U.S. Dist. LEXIS 2541, at \*46-47 (D. Del. Jan. 7, 2020), *R & R adopted*, 2020 U.S. Dist. LEXIS 45851 (D. Del. Mar. 17, 2020) (internal quotations and citations omitted).  Stream's unsupported allegation that it was "weeks away" from reaching an agreement with Alphabet, Inc. in 2020 falls well short of this standard, particularly since Stream

had no prior business relationship with Alphabet, Inc.  SAC ¶44; *Markusic v. Blum*, 2020 Del. Ch. LEXIS 267, at *13 (Del. Ch. Aug. 18, 2020) ("[C]onclusory allegation that [plaintiffs] had an existing and prospective business with Original Firefly does not suffice."), *aff'd*, 284 A.3d 1017 (Del. 2022); *Truinject Corp. v. Galderma, S.A.*, 2020 U.S. Dist. LEXIS 156255, at *18-19 (D. Del. Aug. 28, 2020) (allegations plaintiff entered into a non-disclosure agreement with, or made a pitch presentation to, a third party held "insufficient to plausibly allege a *bona fide* expectation of a business relationship").

The SAC likewise lacks sufficient facts to satisfy the second element of a tortious-interference claim, which requires showing the Moving Defendants knew of the alleged business opportunity and intentionally and improperly interfered with it.  *See Organovo Holdings, Inc.*, 162 A.3d at 122; *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (2012).  At most, the SAC baldly alleges that unidentified individuals made "unreasonable" and unspecified "requests" and "negative statements" resulting in Alphabet, Inc. abandoning an alleged potential agreement.  SAC ¶97.  This is plainly insufficient to permit an inference that the Moving Defendants knew of the business opportunity, let alone improperly interfered with it.  *Id.*  Nor do the remainder of the allegations describing the alleged so-called scheme since, as the Court of Chancery has repeatedly held, the negotiation and execution of the Omnibus Agreement were both lawful and proper.  *See WaveDivision Holdings, LLC*, 49 A.3d at 1174 (holding a creditor's actions to protect its investment do not constitute improper interference).

Finally, the SAC does not even attempt to explain how or why these allegedly "unreasonable requests" and "negative statements" interfered with Stream's alleged discussions or what ostensible "harm" Stream purportedly suffered as a result.  Stream, moreover, neglects to identify any of the "negative statements" to which it refers or to whom each statement is

attributable.  For all of these reasons, Count VI should be dismissed.  *See, e.g.*, *Am. Inst. for Chartered Prop. Cas. Underwriters v. Potter*, 2021 U.S. Dist. LEXIS 22907, at *19-21 (D. Del. Feb. 8, 2021), *R & R adopted*, 2021 U.S. Dist. LEXIS 58014 (D. Del. Mar. 26, 2021); *WaveDivision Holdings, LLC*, 49 A.3d at 1174.

**K.      Stream Fails to State a Claim for Civil RICO (Count VII).**

A claim for liability under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus (5) an injury to business or property, and (6) the racketeering activity must have been the 'but for' cause as well as the proximate cause of the injury."  *LabMD Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022).  Stream bases its RICO claim on allegations that the Moving Defendants engaged in a "pattern of bribery and threats of financial loss."  SAC ¶155.  Even accepting the allegations of the SAC as true, Stream still falls far short of required elements.

First, and most critically, Stream cannot show injury.  Stream alleges that it was harmed by the transfer of its assets after Stream's default on its loans.  *Id.* ¶156.  However, as discussed, the secured creditors had an indisputable right to possess Stream's assets after it defaulted on its loans.  Like Stream's unjust enrichment claim, the secured creditors' exercise of their contractual rights does not constitute a harm to Stream.  *In re Direct Response Media, Inc.*, 466 B.R. at 661.

Second, Stream bases its RICO claim on purported bribery and threats of financial loss, but the allegations in the SAC fail to show a *pattern* of any such activity over the course of at least one year.   "Proving a pattern of racketeering activity requires plaintiffs to show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'"  *Germinaro v. Fidelity Nat'l Title Ins. Co.*, 737 F. App'x 96, 102 (3d Cir. 2018) (quoting *United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011)).  The latter "continuity" requirement "comes in two forms: closed-ended and open-ended.  Closed-ended continuity refers to a closed

period of repeated conduct, and it can be established by proving a series of related predicates extending over a substantial period of time.  Open-ended continuity, on the other hand, refers 'to past conduct that by its nature projects into the future with a threat of repetition." *Germinaro*, 737 F. App'x at 102.

The SAC plainly describes closed-ended continuity.  In the Third Circuit, however, "acts spanning less than twelve months fail as a matter of law to establish closed-ended continuity." *Id.* at 103.  At best, Stream alleges conduct spanning a few months, from employment offers to Stream's employees that Stream construes as "bribes" in November 2019 to the purportedly "forced" defaults in March 2020 and the Omnibus Agreement in May 2020.  SAC ¶¶65, 75, 81. This is insufficient as a matter of law to establish continuity.  *Germinaro*, 737 F. App'x at 103. Consequently, Stream cannot establish the continuity requirement to establish a pattern of racketeering.  Thus, Count VII should be dismissed.

## CONCLUSION

For the foregoing reasons, the Moving Defendants respectfully request this Court enter an order dismissing the SAC with prejudice.

Dated: March 13, 2023

/s/ Tyler B. Burns
Tyler B. Burns (No. 6978)

OF COUNSEL:

Ballard Spahr LLP
919 N. Market Street, 11ᵗʰ Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Burnst@ballardspahr.com

Terence M. Grugan (*pro hac vice*)
Emilia L. McKee Vassallo (*pro hac vice*)
Izabella Babchinetskaya (*pro hac vice to be filed*)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Grugant@ballardspahr.com
McKeeVassalloe@ballardspahr.com
Babchinetskayai@ballardspahr.com

*Counsel for Alastair Crawford, Patrick Miles, Robert Petch, and Shadron Stastney*

OF COUNSEL:

/s/ Alexandra D. Rogin
Alexandra D. Rogin (No. 6197)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
222 Delaware Avenue, Suite 700
Wilmington, DE 19801
Tel: (305) 552-2935
arogin@eckertseamans.com

David M. Laigaie (*pro hac vice*)
Eli Granek (*pro hac vice*)
Shari Parker (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place, Fl 22
50 S. 16th Street
Philadelphia, PA 19102
P: (215) 851-8400
dlaigaie@eckertseamans.com
egranek@eckertseamans.com
sparker@eckertseamans.com

*Attorneys for Asaf Gola*

OF COUNSEL:

/s/ Megan E. O'Connor
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

Thomas A. Warns (*pro hac vice*)
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-4009
tom.warns@klgates.com

*Attorneys for Hawk Investment Holdings Limited and Arthur Leonard Robert Morton*

31