**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| STREAM TV NETWORKS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 22-851-CJB |
| SHADRON STASTNEY, ARTHUR LEONARD ROBERT MORTON, ALASTAIR CRAWFORD, ASAF GOLA, KEVIN GOLLOP, KRZYSZTOF KABACINSKI, PATRICK MILES, ROBERT PETCH, HAWK INVESTMENT HOLDINGS LIMITED, and JOHN DOES 1-75, | |
| Defendants. | |

**DEFENDANTS HAWK INVESTMENT HOLDINGS LIMITED AND ARTHUR LEONARD ROBERT MORTON'S OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF <u>PERSONAL JURISDICTION</u>**

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

*Attorneys for Defendant Hawk Investment
Holdings Ltd.*

*Of counsel:*

Thomas A. Warns
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-4009
tom.warns@klgates.com

Dated: March 13, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    Stream and the Rajans.......................................................................... 3

    B.    Stream Entered Into and Defaulted on the Hawk Notes ...................................... 3

    C.    Stream's Creditors Enter Into Omnibus Agreement with Stream ........................ 4

    D.    Delaware Supreme Court Finds the Omnibus Agreement Invalid ....................... 5

    E.    Delaware Chancery Court Collateral Estoppel Opinion ...................................... 6

    F.    Defendants Hawk and Mr. Morton ....................................................... 7

ARGUMENT ....................................................................................................................... 8

I.    DISMISSAL IS APPROPRIATE BECAUSE THE COURT CANNOT
    EXERCISE PERSONAL JURISDICTION OVER MR. MORTON AND
    HAWK ....................................................................................................................... 8

    A.    Standard of Review............................................................................. 9

    B.    Plaintiff Cannot Demonstrate that Mr. Morton or Hawk is Subject to
        Jurisdiction Under Delaware's Long-Arm Statute ............................................ 10

    C.    Plaintiff Cannot Demonstrate that Conspiracy Jurisdiction Exists..................... 15

    D.    Hawk's Contacts with Delaware May Not Be Imputed to Mr. Morton.............. 18

    E.    Plaintiff Cannot Demonstrate a Constitutional Basis to Assert
        Jurisdiction over Mr. Morton............................................................. 20

CONCLUSION................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*C.R. Bard, Inc. v. Guidant Corp.*,
  997 F. Supp. 556 (D. Del. 1998)............................................................18

*Comput. People, Inc. v. Best Int'l Grp., Inc.*,
  1999 WL 288119 (Del. Ch. Apr. 27, 1999) ...........................................11, 15, 16

*Fortis Advisors LLC v. Johnson & Johnson*,
  2021 WL 5893997 (Del. Ch. Dec. 13, 2021) .........................................14

*Gordian Med., Inc. v. Misty Vaughn and Curitec, LLC*,
  2022 WL 1443917 (D. Del., May 6, 2022)...............................................9

*Greenly v. Davis*,
  486 A.2d 669 (Del. 1984) .......................................................................12

*Hanson v. Denckla*,
  357 U.S. 235 (1958)................................................................................20

*Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*,
  2022 WL 17258460 (Del. Ch. Nov. 29, 2022) .........................................2

*Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*,
  611 A.2d 476 (Del. 1992) .......................................................................10

*Iotex Commc'ns, Inc. v. Defries*,
  1998 WL 914265 (Del. Ch. Dec. 21, 1998)............................................14

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989).............................................................17, 18, 19

*Newspan, Inc. v. Hearthstone Funding Corp.*,
  1994 WL 198721 (Del. Ch. May 10, 1994).............................................15

*O'Connor v. Sandy Lane Hotel Co.*,
  496 F.3d 312 (3d Cir. 2007)....................................................................20

*Parker v. Learn Skills Corp.*,
  530 F. Supp. 2d 661 (D. Del. 2008)........................................................10, 12

*In re Raytrans Holding, Inc.*,
  573 B.R. 121 (Bankr. D. Del. 2017) .........................................................3

*Ruggiero v. FuturaGene, plc.*,
  948 A.2d 1124 (Del. Ch. 2008)...............................................................10

ii

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*,
  2022 WL 4491925 (Del. Ch. Sept. 28, 2022) ..........................................................3, 6

*Stream TV Networks, Inc. v. Seecubic, Inc.*,
  2022 WL 3227785 (Del.Ch. Aug. 09, 2022) ...............................................................6

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
  250 A.3d 1016 (Del. Ch. 2020)...................................................................................4

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
  279 A.3d 323 (Del. 2022) ............................................................................................4

*TriStrata Tech., Inc. v. Neoteric Cosmetics., Inc.*,
  961 F. Supp. 686 (D. Del. 1997)................................................................................12

*Werner v. Miller Tech. Mgmt., L.P.*,
  831 A.2d 318 (Del. Ch. 2003)....................................................................................15

**Statutes**

8 *Del. C.* § 225 ..................................................................................................................7

10 *Del. C.* § 3104 .................................................................................................. *passim*

10 *Del. C.* § 3114 ..............................................................................................................20

**Other Authorities**

Fed. R. Civ. P. 12(b)(2)......................................................................................9, 10, 12

Defendants Hawk Investment Holdings Limited ("Hawk") and Arthur Leonard Robert Morton ("Mr. Morton") submit this opening brief in support of their motion pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(2) to dismiss Stream TV Network, Inc.'s ("Stream" or "Plaintiff") Second Amended Complaint ("SAC"). Dkt. 54.

## PRELIMINARY STATEMENT

Plaintiff alleges there exists a wide-ranging conspiracy involving nine different named individuals and entities, as well as 75 anonymous "John Does," all conspiring together to bribe directors of Stream and steal its assets. The centerpiece of Plaintiff's conspiracy theory is that the defendants conspired together to "manufacture" defaults on certain loans belonging to Stream, so that the defendants could force Stream to turn over its assets. Plaintiff's conspiracy theory culminates with the Omnibus Agreement, which Plaintiff alleges was the mechanism by which the conspiracy wrongfully converted Stream's assets.

Stream's wild accusations, however, are far from the truth. The reality is that Stream borrowed millions of dollars over a ten-year period, became insolvent, and did not repay its secured lenders. When Stream defaulted on those loans, Stream's secured lenders had every right to take possession of Stream's collateral. Instead, those secured lenders decided to enter into a friendly foreclosure arrangement with Stream's independent directors, memorialized in the Omnibus Agreement, that would have transferred Stream's assets to a new entity in which Stream's shareholders would have received equity. While the Omnibus Agreement was approved by Stream's Board of Directors, the Rajan brothers, who own a controlling share of Stream's equity, quickly set about invalidating the Omnibus Agreement any way they could.

The Delaware Court of Chancery found the Omnibus Agreement to be valid, and entered a preliminary injunction which prevented Stream from interfering with its enforcement. On appeal,

however, the Delaware Supreme Court overturned the Omnibus Agreement on a technicality, finding it had not been approved by Class B shareholders.

In the aftermath of that ruling, Stream brings this lawsuit recasting the Omnibus Agreement as the lynchpin of a vast conspiracy among the Defendants. The Rajans, through Stream, have been fighting tooth and nail in multiple courts to avoid the inevitable implications of Stream's default on its secured debt. But Stream is collaterally estopped from advancing its conspiracy theory. The Delaware Court of Chancery has already explicitly found that Stream is collaterally estopped from re-litigating that Hawk has secured debt with Stream, Hawk has secured creditor rights, and that Stream defaulted on its debt to Hawk.

Stream now turns to this Court for one last Hail Mary because of its losses in a Delaware state court. However, no amount of "slippery language, which Stream has a history of deploying," will change the outcome in this litigation. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *16 (Del. Ch. Nov. 29, 2022) (hereinafter the "Chancery Court Collateral Estoppel Opinion"). Collateral estoppel bars Plaintiff from advancing its claims. Even if Stream were permitted to re-litigate its default on its debt, the SAC still fails to establish that personal jurisdiction exists over Hawk and Mr. Morton. None of the conclusory allegations added in Plaintiff's most recent amendment to the complaint come close to changing that outcome.

In short, the SAC and its outlandish allegations must be dismissed in its entirety, and with prejudice.

## **FACTUAL BACKGROUND**

Hawk and Mr. Morton incorporate the Statement of Facts from Defendants' Joint Memorandum of Law in Support of the Motions to Dismiss the Second Amended Complaint for Failure to State a Claim into this brief. In addition, Mr. Morton and Hawk also incorporate the below facts relevant to this motion to dismiss for lack of personal jurisdiction.

### A.      Stream and the Rajans

Plaintiff Stream TV Networks, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. SAC ¶ 11. Stream is a media company that aims to create 3-D display technology that would not require the viewer to wear any special glasses. SAC ¶ 11. Stream formed subsidiaries in the Netherlands, and it is through these operating subsidiaries that Stream hired engineers to develop Stream's technology. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1022 (Del. Ch. 2020) (hereinafter the "Chancery Court PI Opinion.").[1] Stream's "principal operating subsidiary" is Technovative Media, Inc. ("Technovative"). *See In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022). The Rajan family controls Stream. SAC ¶ 12.

### B.      Stream Entered Into and Defaulted on the Hawk Notes

As Stream admits, between 2011 and 2012, SLS loaned Stream $6 million via multiple senior notes, secured against all assets of Stream and its subsidiaries. SAC ¶ 49. Further, between 2014 and 2020, Hawk loaned Stream over £50 million plus $1.336 million through a series of 17 separate notes (the "Hawk Notes"). SAC ¶ 50.

By at least February 2020, Stream defaulted on the Hawk Notes. *See, e.g., Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022) ("by the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.") (hereinafter the "Delaware Supreme Court Decision"); *Chancery Court PI Opinion*, 250 A.3d at 1020 ("By the time the Omnibus Agreement was executed, Stream had defaulted on more than $50 million in debt to its secured creditors."); *Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14 ("the

---

[1] This Court is permitted to take judicial notice of other judicial opinions, including opinions from Delaware's state courts. *See, e.g., In re Raytrans Holding, Inc.*, 573 B.R. 121 (Bankr. D. Del. 2017) (taking judicial notice of Delaware state court opinions and dismissing multiple claims in the complaint under doctrine of collateral estoppel).

doctrine of collateral estoppel prevents Stream from relitigating the following issues: Hawk holds secured debt in Stream; Stream defaulted on that debt…"). In addition, Stream also defaulted on the Hawk Notes when it filed for bankruptcy in February 25, 2021 and by consenting to an involuntary bankruptcy filed on May 23, 2021. *See In re Stream TV Networks, Inc.*, Case No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021); *In re Stream TV Networks, Inc.*, Case No. 21-10848-KBO (Bankr. D. Del. May 23, 2021).

### C.     Stream's Creditors Enter Into the Omnibus Agreement with Stream

After Stream defaulted on the notes, a "flurry of activity" followed, which resulted in the appointment of the Outside Directors[2] to Stream's board and the creation of the Resolution Committee on May 4, 2020. SAC ¶ 76. The directors on the Resolution Committee were Asaf Gola and Kevin Gollop. SAC ¶ 71.

On May 6, 2020, the Outside Directors approved the Omnibus Agreement, "purporting to bind Stream to a global settlement of pending litigations. The Omnibus Agreement also contemplated the transfer of all of Stream's assets to a 'Newco' established and controlled by SLS and Hawk. 'Newco' was later identified as SeeCubic." SAC ¶ 77. The Rajan Brothers abstained from the vote, but the three directors who voted in favor of the Omnibus Agreement constituted a quorum of the Stream Board. *Delaware Supreme Court Opinion*, 279 A.3d at 328.

As described by the Delaware Supreme Court:

> The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares [for shares in SeeCubic].

*Delaware Supreme Court Opinion*, 279 A.3d at 328 (internal quotations omitted); *see also* SAC ¶ 81.

---

[2] The SAC defines the Outside Directors as Mssrs. Kabacinski, Gola, and Gollop.

### D.      Delaware Supreme Court Finds the Omnibus Agreement Invalid

Almost immediately after the Omnibus Agreement was signed, the Rajans set about to have it invalidated. *Delaware Supreme Court Opinion*, 279 A.3d at 329. Stream filed suit on September 8, 2020, in the Delaware Court of Chancery, against SeeCubic (the "Omnibus Agreement Litigation"). In the Omnibus Agreement Litigation, Stream sought to invalidate the Omnibus Agreement and moved for a temporary restraining order which barred SeeCubic from enforcing the Omnibus Agreement. *Id.* SeeCubic filed counterclaims, and also sought a preliminary injunction to prevent Stream from interfering with the enforcement of the Omnibus Agreement.

The Court of Chancery entered an opinion and order on December 8, 2020, which in relevant part found that the Resolution Committee had the authority to bind Stream, and that the Omnibus Agreement did not require approval from the Class B shareholders of Stream.  *See Chancery Court PI Opinion*, 250 A.3d at 1046. The Chancery Court PI Opinion was subsequently entered as a partial final judgment, which Stream appealed to the Delaware Supreme Court.

On June 15, 2022, the Delaware Supreme Court issued an opinion finding that the Omnibus Agreement was not valid because Stream's Class B Shareholders did not vote to approve it. SAC ¶ 111. The Delaware Supreme Court found that approval of the Omnibus Agreement required approval by Stream's Class B shareholders because the Omnibus Agreement effected an "Asset Transfer" under Stream's charter. *The Delaware Supreme Court Opinion*, 279 A.3d at 338.

Despite Plaintiff's claim that "the Supreme Court's ruling confirms that Gollop and Gola wrongfully caused Stream TV to enter into the Omnibus Agreement and that Defendants' appropriation of Stream TV's assets was unlawful" (SAC ¶ 111), the Delaware Supreme Court never described the Omnibus Agreement as "unlawful" or "wrongful."

Contrary to Defendants' assertions, on remand following the Delaware Supreme Court Opinion, the Delaware Court of Chancery found that Stream's secured creditors retained their

rights in the collateral. *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 3227785, at *1 (Del.Ch. Aug. 09, 2022) (Once [the return of the assets to Stream as contemplated by the Delaware Supreme Court Opinion] has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream."); *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022) ("The court believes that the rights that secure creditors' rights [sic] are strong and may well result in Stream having to transfer the Legacy Stream Assets back to SeeCubic in its capacity as Hawk's designee and agent.").

### E.     Delaware Chancery Court Collateral Estoppel Opinion

On October 17, 2022, Hawk attempted to exercise its secured creditor rights by replacing the directors of Technovative, a wholly-owned subsidiary of Stream, and ordering Technovative to marshal the collateral being held by Technovative. *See* Ex. 1 ¶¶ 5-8.[3] When Stream and the Rajans refused to comply, Hawk brought suit pursuant to 8 *Del. C.* § 225 in the Delaware Court of Chancery, seeking a declaratory judgment that it had validly reconstituted the board of directors of Stream. *See Hawk Investment Holdings, Ltd. v. Stream TV Networks, Inc.*, C.A. No. 2022-0930-JTL (Del. Ch. 2022) (hereinafter the "225 Action.").

In the 225 Action, Hawk moved for partial summary judgment on the grounds that Stream was collaterally estopped from advancing several arguments that were adjudicated adversely to Stream in the Omnibus Agreement Litigation. The Court of Chancery granted Hawk's motion for partial summary judgment, and specifically found the following:

> In this case, the doctrine of collateral estoppel prevents Stream from relitigating the following issues:
>
> • Hawk holds secured debt in Stream;

---

[3] "Ex. _" refers to the exhibits attached to the Declaration of Steven L. Caponi in Support of Defendants Hawk Investment Holdings Limited and Arthur Leonard Robert Morton's Opening Brief in Support of their Motion to Dismiss Plaintiff's Second Amended Complaint for Lack of Personal Jurisdiction filed contemporaneously herewith.

• Stream defaulted on that debt;
• Hawk has valid creditor rights;
• Stream cannot convert that secured debt to equity without raising additional capital; and
• as of November 10, 2021, Stream had not converted the secured debt.

Each of these issues was litigated in the Omnibus Agreement Litigation and resulted in a final decision on the merits.

*Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14–15. The Court also

noted that "Stream had every incentive to raise all available challenges to the validity of the secured

debt that supported the Omnibus Agreement." *Id*. at *16.

The Court of Chancery explicitly ruled that collateral estoppel prevented Stream from

advancing its argument that Stream's defaults were "manufactured" by some sort of conspiracy:

Evidencing its wily ways with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020," Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage." *Id*. at 2–3. That is another way of contending that a default never really occurred. If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation. Collateral estoppel bars Stream from advancing that argument now.

*Id*. at *17. The collateral estoppel effect of the Court's rulings extends to November 10, 2021, the

date on which the Court of Chancery entered a partial final summary judgment against Stream. *Id*.

at *17 ("Collaterel estoppel does not bar Stream from litigating about events that may have

happened after November 10, 2021.").

### F.   Defendants Hawk and Mr. Morton

Plaintiff alleges that "[u]pon information and belief, Mr. Morton owns and/or controls

Defendant [Hawk], Stream TV's junior secured creditor, through other entities owned and

controlled by him, including Albany Directors Limited." SAC ¶¶ 15, 16. But this is not true.

Albany Directors Limited ("Albany") is an independent company and the sole director of Hawk.

Ex. 2 ¶ 1.

Hawk is owned by the Morton Family Trust, and Mr. Morton is not a trustee of the Morton Family Trust. *Id.* ¶ 2. Mr. Morton is not a director, officer, or manager of Hawk, and has no decision-making authority at Hawk. *Id.* ¶ 3. Mr. Morton is solely an investment advisor to Hawk, and it is Albany that decides what actions Hawk should take. *Id.* ¶ 4; Ex. 3 at 14:17-15:19 ("I have a consulting agreement, which is with my company called Hawk Consulting Limited…And I have this contract with Hawk, so they contact me for advice from time to time and I -- I will make recommendations to them in terms of investments and then it's up to them to make a decision as to whether they wish to follow that or not."); Ex. 3 at 17:12-18:2 ("there isn't an investment committee as such, because basically all the investments are made and controlled by the directors of the trust, which is Albany Trustees, and they make all the decisions and they run it.").

## ARGUMENT

### I.  DISMISSAL IS APPROPRIATE BECAUSE THE COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER MR. MORTON AND HAWK

Dismissal of all claims against Mr. Morton and Hawk is warranted under Fed. R. Civ. P. 12(b)(2), because this Court does not have personal jurisdiction over either Hawk or Mr. Morton. To exercise personal jurisdiction over a non-resident defendant, there must exist—at a minimum—a meaningful act or impact that occurred in Delaware. Here, however, the SAC is devoid of any facts suggesting Mr. Morton or Hawk ever set foot in Delaware, let alone committed a tortious act in Delaware. Similarly, the SAC fails to plead that Hawk or Mr. Morton took an action outside of Delaware that had a meaningful impact inside Delaware. As a result, the SAC cannot satisfy the requirements of Delaware's long arm statute, 10 *Del. C.* § 3104.

Unable to plead facts that would support jurisdiction, the First Amended Complaint only advanced three theories for the exercise of personal jurisdiction over Hawk and Mr. Morton: (i) that they directly transacted business and caused tortious injury in Delaware under the long-arm

statute; (ii) that they participated in a conspiracy which caused an injury in Delaware; and (iii) that Hawk's alleged contacts should be imputed to Mr. Morton because of his alleged ownership and control of Hawk, which serves to subject Mr. Morton to personal jurisdiction.  In the SAC, Plaintiff adds one new theory and modifies another: (iv) that Hawk consented to jurisdiction in Delaware by executing the Omnibus Agreement, which contained a forum selection clause in favor of Delaware, and (v) that Mr. Morton is the "alter ego" of Hawk. SAC ¶¶ 26, 27.  Each theory has unique flaws, but they all share a common fatal flaw.  Specifically, there are no tortious acts that are alleged to have occurred in Delaware.  Additionally, collateral estoppel bars Plaintiff from advancing its argument that the defendants manufactured the defaults, which argument is a necessary element of their conspiracy theory of jurisdiction. Because the SAC is completely devoid of any particularized allegations sufficient to subject Mr. Morton or Hawk to this Court's jurisdiction, the SAC should be dismissed in its entirety as to Hawk and Mr. Morton.

A.    **Standard of Review**

Where federal court jurisdiction is based on diversity of citizenship, federal courts must analyze the long-arm statute of the state in which the court is located. *See Gordian Med., Inc. v. Misty Vaughn and Curitec, LLC*, 2022 WL 1443917 at *3 (D. Del., May 6, 2022).

Delaware courts apply a two-step analysis in determining the existence of personal jurisdiction over a nonresident defendant.  First, the Court must "consider whether Delaware's long arm statute is applicable."  *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480–81 (Del. 1992).  "Next, the court must determine whether subjecting the nonresident defendant to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment."  *Id.* at 481.  The burden rests with the plaintiff to make "a prima facie case establishing jurisdiction over the nonresident." *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1131 (Del. Ch. 2008). Conclusory allegations regarding jurisdiction are insufficient to defeat a motion

to dismiss. *See Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661, 670 (D. Del. 2008) ("[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.").

> **B.     Plaintiff Cannot Demonstrate that Mr. Morton or Hawk is Subject to Jurisdiction Under Delaware's Long-Arm Statute**

Plaintiff appears to primarily argue this Court has personal jurisdiction over Mr. Morton and Hawk because they "transact business and perform[] work in Delaware, and because [they] caused tortious injury to Stream TV within Delaware."  SAC ¶ 26, 30.  These conclusory allegations, which misstate the applicable requirements under the long-arm statute, implicates 10 *Del. C.* § 3104(c)(1), (3), and (4). As a nonresident defendant, this Court may only exercise personal jurisdiction over Hawk and Mr. Morton pursuant to 10 *Del. C.* § 3104(c) if Hawk or Mr. Morton:

> (1) transacts any business or performs any character of work or service in the State…(3) causes tortious injury in the state by an act or omission in this State…[or] (4) causes tortious injury in the state or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State, or derives substantial revenue from services, or things consumed in the State.

10 *Del. C.* § 3104(c)(1),(3)-(4). Subsections (c)(1) and (c)(3) authorize "transactional" or "specific" jurisdiction in cases where the cause of action arises out of the defendant's conduct in the State of Delaware. *See Comput. People, Inc. v. Best Int'l Grp., Inc.*, 1999 WL 288119, at \*5 (Del. Ch. Apr. 27, 1999). In contrast, subsection (c)(4) implicates tortious impacts from outside the state felt inside it, but requires additional contacts with Delaware on the part of defendant.

With regard to Subsections (c)(1) and (c)(3), to establish personal jurisdiction the SAC must allege, but does not, that Mr. Morton and Hawk engaged in tortious conduct within the state of Delaware or caused a tortious impact in Delaware.  While the SAC slanderously attacks Mr.

Morton's personal character, it fails to allege a single tortious act or impact that occurred in Delaware as a result of Mr. Morton or Hawk's conduct outside of the state.  Indeed, none of the conclusory allegations in the SAC allege or establish that Mr. Morton or Hawk "transacts business or performs any character of work or service in the State," as is required by 10 *Del. C.* § 3104(c)(1).

What is alleged in the SAC are a series of interactions between Stream and its secured lenders, almost all of which occurred outside Delaware.  Specifically, Plaintiff alleges that:

a) Mr. Morton concocted a scheme with Mr. Stastney and Mr. Crawford to transfer Stream's assets to a new entity, directed Stream employees in furtherance of the scheme, and recruited Hawk for the scheme;

b) Hawk loaned money to Stream;

c) Mr. Morton requested that Mr. Kabacinski serve as a director of Stream as part of the scheme;

d) Hawk "defamed the Rajans in an attempt to prevent Stream TV from raising funds;"

e) Mr. Morton "maintained a good relationship with the Rajans" as part of the scheme;

f) Hawk entered into the Omnibus Agreement, and Mr. Morton enticed and encouraged certain Stream directors to approve the Omnibus Agreement; and

g) Hawk exercised its rights under the Notes and pledge agreements and initiated a proceeding in the Delaware Court of Chancery pursuant to 8 *Del. C.* § 225.

*See* SAC ¶¶ 6, 22, 50, 54, 60-61, 63, 65-66, 79, 117-18, 127, 145.

As an initial matter, these threadbare allegations are insufficient to prevail over a motion to dismiss pursuant to FRCP 12(b)(2).  *See Parker*, 530 F. Supp. 2d at 670; *see also Greenly v. Davis*, 486 A.2d 669, 670 (Del. 1984) (affirming dismissal for lack of personal jurisdiction and assigning "little weight to vague, general assertions" of plaintiff and stating the "burden was upon plaintiff to make a specific showing that the Delaware court has jurisdiction under the long-arm statute"). The law requires more than unsupported conclusory allegations before a court may lawfully exercise personal jurisdiction over a nonresident defendant.  The SAC falls woefully short

of the requirement to plead particularized facts necessary to support personal jurisdiction over Mr. Morton and Hawk.

Even if, however, one takes these allegations at face value, they still fail to satisfy subsections (c)(1), (c)(3), and (c)(4) because all but one of the actions are alleged to have occurred outside Delaware. *See TriStrata Tech., Inc. v. Neoteric Cosmetics., Inc.*, 961 F. Supp. 686, 690-91 (D. Del. 1997) (under subsections (c)(1) and (c)(3) "some act must actually occur in Delaware" and under subsection (c)(4) there must be a "persistent course of conduct" in Delaware). The centerpiece of the conspiracy, the Omnibus Agreement (which Mr. Morton is not even a party to), is not even alleged to have been negotiated in Delaware.  Additionally, none of the parties have any relationship or contacts with Delaware.  Equally troubling, none of the allegedly improper acts caused a tortious impact in Delaware.

With regard to the Omnibus Agreement, it is undisputed that the document was negotiated, drafted and executed outside of Delaware, and a fact the SAC fails to contradict.  As for the parties who were involved with the Omnibus Agreement, none were residents of Delaware: Mr. Stastney - New  Jersey (SAC ¶ 14); Messrs. Morton and Gollop - Bailiwick of Jersey (SAC ¶¶ 15,21); Hawk - Bailiwick of Guernsey (SAC ¶ 16); Messrs. Crawford, Miles, Petch, and Kabacinski - United Kingdom (SAC ¶ 17-19, 22); and Mr. Gola - New York (SAC ¶ 20).  There are no particularized allegations that any of these nonresident defendants committed any acts in Delaware related to the claims asserted in the SAC.[4]

---

[4] To the extent that Stream argues that merely executing the Omnibus Agreement subjected Hawk to personal jurisdiction in Delaware because Stream is a Delaware entity, Delaware courts "have rejected attempts to satisfy subsection (c)(1) [of the long-arm statute] based upon little more than a contract partner's status as a Delaware company or resident." *Yankees Entertainment and Sports Network, LLC v. Hartford Fire Ins. Co.*, 2022 WL 6735556, at *4 (D. Del Oct. 11, 2022).

Stream argues that by executing the Omnibus Agreement, which contains a Delaware forum selection clause, Hawk has consented to jurisdiction in Delaware for this case.  This is clearly not true. This Action does not "arise out of" or "in connection with" the Omnibus Agreement. SAC, Ex. A (Omnibus Agreement, § 5.4).  Plaintiff does not assert a claim for breach of the Omnibus Agreement against any defendant, and in any event the Omnibus Agreement is dead.  *See Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 3283863, at *1 (Del. Ch. Aug. 10, 2022) ("In accordance with the mandate of the Delaware Supreme Court…[t]he Omnibus Agreement is therefore without legal effect.").  Stream cannot have it both ways: Stream fought tooth and nail to have the Omnibus Agreement invalidated, yet it now seeks to enforce the agreement's forum selection clause to exercise personal jurisdiction over Hawk in a different dispute. This position is legally untenable.

For its part, Stream is a Delaware entity, but has no physical presence in Delaware and maintains its principal place of business is Pennsylvania. SAC ¶ 11.  Stream is a holding company whose operations are carried out through various operating subsidiaries which conduct the research and development behind Stream's technology.  They are located in the Netherlands. *See* Ex. 4 ¶ 20 (admitting that "Stream TV was the 100% owner of [Technovative], a Delaware corporation, which in turn is the 100% direct or indirect owner of Technology Holdings Delaware, LLC, Media Holdings Delaware, LLC, Ultra-D Ventures, C.V., Ultra-D Coöperatief U.A., Stream TV International B.V. and SeeCubic B.V. (with Ultra-D Ventures, C.V., Ultra-D Coöperatief U.A., and Stream TV International B.V., the "Dutch Subsidiaries"). The SAC is devoid of any allegation that any of the parties ever set foot in Delaware in furtherance of or as part of the implementation of a tortious injury – let alone directed any part of a conspiracy towards Delaware.

There are only two connections to Delaware that Plaintiff alleges. The first is that Stream is incorporated in Delaware. But this is too thin a reed upon which Plaintiff can rest its jurisdictional argument. Defendants have found no case in which a Delaware court has held that a plaintiff corporation's injury was said to take place in Delaware solely by virtue of a plaintiff's incorporation in Delaware.  This is not surprising, as Delaware precedent holds the opposite is true. *See Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *6 (Del. Ch. Dec. 13, 2021); *see also Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265 at * 7–8 (Del. Ch. Dec. 21, 1998) ("In the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this State[ ] will not satisfy the [requirements of conspiracy theory jurisdiction].").

The second is that Hawk exercised its rights by issuing a proxy notice under the Notes after Stream defaulted, and by initiating a proceeding pursuant to 8 *Del. C.* § 225.  These are the only actions that are alleged to have occurred in Delaware. But Hawk has not submitted to this Court's jurisdiction by vindicating its rights in an unrelated lawsuit in the same jurisdiction. *See Yankees Enter. and Sports Network, LLC v Hartford Fire Ins. Co.*, 2022 WL 6735556, at *2 (D. Del Oct. 11, 2022). In *Yankees Entertainment*, the District Court stated that under Delaware law, a party has only consented to jurisdiction via litigation if it instituted a "related suit" that has a "logical relationship" with the present suit. *Id*. A "logical relationship exists where there are "parallel suits between identical parties." *Id*.

According to the *Yankees Entertainment* test, this Action is not a "parallel suit" because it concerns different issues than the present suit. In the 225 Action, Hawk seeks a declaration that it validly replaced the director of Technovative and amended the bylaws of Technovative, whereas here, Stream alleges there was a vast conspiracy to steal its assets via the Omnibus Agreement. In

14

addition, the parties are not identical, as Hawk is the plaintiff in the 225 Action and the defendants are Stream and Technovative. In the present suit, the plaintiff is Stream but the defendants are Hawk, a number of officers, directors, and investors in Stream, and "John Does 1-75." This is insufficient to satisfy the *Yankees Entertainment* test.

In addition, Hawk's decision to issue a proxy notice pursuant to its secured creditor rights, and its decision to initiate the 225 Action, cannot be tortious.  The Court of Chancery explicitly found that Hawk had standing to bring the 225 Action, and found that Stream was collaterally estopped from arguing that any of the prerequisites to Hawk's exercise of the secured creditor rights did not exist. *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *8, 14-15.  Stream even concedes that Hawk had the right to bring the 225 Action. *Id*. at *7 ("Stream concedes that Hawk has statutory standing as a stockholder of Stream to pursue this Section 225 proceeding.").  Hawk's exercise of its secured creditor and statutory rights is not tortious conduct that can subject Hawk to personal jurisdiction in Delaware.

Plaintiff cannot demonstrate jurisdiction exists under subsection (c)(1) or (c)(3), and it certainly has no hope of satisfying the "greater, more continuous pattern of contacts" with the forum state that are required under subsection (c)(4).  *Comput. People*, 1999 WL 288119, at *5.

## C.    Plaintiff Cannot Demonstrate that Conspiracy Jurisdiction Exists

Plaintiff next relies on the conspiracy theory of jurisdiction, which stems from 10 *Del. C.* § 3104. Even if the Court were to find that the SAC contained allegations of actions that took place in Delaware, the conspiracy theory of jurisdiction would still fail because Plaintiff is collaterally estopped from arguing that defendants carried out a vast conspiracy.

Under the conspiracy theory of jurisdiction, a plaintiff may establish personal jurisdiction over a nonresident defendant only if it satisfies the following five elements:

(1) a conspiracy...existed;
(2) the defendant was a member of the conspiracy;
(3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state;
(4) the defendant knew or had reason to know the act in the forum state or that acts outside the forum state would have an effect in the forum state; and
(5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Comput. People,* 1999 WL 288119, at *6.

"Importantly, this test is a strict test that should be construed narrowly." *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 330 (Del. Ch. 2003). This is necessary to prevent the conspiracy theory of jurisdiction from becoming a "facile way for a plaintiff to circumvent the minimum contacts requirement of *International Shoe Co. v. Washington*." *Comput. People*, 1999 WL 288119, at *6. Furthermore, the "application of personal jurisdiction under the conspiracy theory requires factual proof of each enumerated element." *Id*; *see also Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *8 (Del. Ch. May 10, 1994); *Comput. People*, 1999 WL 288119, at *6 ("where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleading that are unsupported by evidence.").

Plaintiff cannot meet this strict test. In the instant case, collateral estoppel bars Stream from arguing a conspiracy to manufacture Stream's default on the Hawk Notes and seize Stream's assets took place. Stream had every incentive in the Omnibus Agreement Litigation to argue that the defaults were illegitimate because they were "manufactured." The record from the Delaware Court of Chancery and Delaware Supreme Court is clear that Stream's secured creditors had rights to Stream's assets following Stream's default, but that those secured creditors sought instead to enter into a friendly foreclosure via the Omnibus Agreement which was approved by Stream's Outside Directors. The Delaware Court of Chancery held in the 225 Action that:

16

- Hawk holds secured debt in Stream;
- Stream defaulted on that debt; and
- Hawk has valid creditor rights.

*Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14–15.

The Court of Chancery explicitly ruled that Stream is collaterally estopped from arguing there was a conspiracy which "manufactured the defaults. *Id*. at *17 ("Stream [contends that it] nevertheless remains free to litigate its contention that there was an 'unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage.' That is another way of contending that a default never really occurred. If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation.") (internal citation omitted).

The Omnibus Agreement itself belies any claims of a conspiracy. The Omnibus Agreement was not hidden in any way; it was executed out in the open, and approved by Stream's outside directors. It was approved as an alternative to the secured creditors exercising their secured creditor rights.  The Delaware Court of Chancery approved the validity of the Omnibus Agreement, though it was later overturned by the Delaware Supreme Court on a technicality.

Stream cannot attempt to raise its conspiracy argument now because of the doctrine of collateral estoppel. Indeed, collateral estoppel limits Stream to only litigating the actions that took place after November 10, 2021. *See Chancery Court Collateral Estoppel Opinion,* 2022 WL 17258460, at *17. But the only actions even alleged to take place after November 10, 2021—the exercise of the secured creditor rights and initiation of the 225 Action—are not tortious. If Stream cannot demonstrate that the defaults under the Notes were "artificially manufactured" as part of a conspiracy to steal Stream's assets, Stream's conspiracy theory collapses like a house of cards.

### D.    Hawk's Contacts with Delaware May Not Be Imputed to Mr. Morton

In the SAC, Plaintiff asserts in conclusory fashion that "Morton completely dominates Hawk, his alter ego, because he caused Hawk to sign the Omnibus Agreement." SAC ¶ 26. Even assuming, *arguendo*, that collateral estoppel was not a complete bar to Plaintiff's conspiracy jurisdiction theory and that Plaintiff could demonstrate that Hawk had sufficient contacts with Delaware to exercise personal jurisdiction, those contacts cannot be imputed to Mr. Morton.

Stream cannot demonstrate that Hawk is an alter ego of Mr. Morton, and therefore Hawk's contacts to Delaware cannot be imputed to Mr. Morton. "Disregard of the corporate entity is appropriate only in exceptional circumstances," and it is "the party who wishes the court to disregard that form bears the burden of proving that there are substantial reasons for doing so." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) (internal quotation omitted). Under the alter ego theory, "the party asserting jurisdiction must establish some fraud, injustice, or inequity in the use of the corporate form." *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 559 (D. Del. 1998). In addition, factors that may indicate an alter ego relationship include a lack of corporate formalities, commingling of assets and operations, and the exercise of complete domination and control over the company. *Mobil Oil*, 718 F.Supp. at 270.

Aside from Plaintiff's conclusory allegation that "Morton completely dominates Hawk," Plaintiff has not pleaded any allegations demonstrating that Mr. Morton exercises complete domination or control over Hawk. Plaintiff alleges "upon information and belief, Morton owns and/or controls Defendant [Hawk], Stream TV's junior secured creditor, through other entities owned and controlled by him, including Albany Directors Limited," and that "Morton controls Hawk and is the only decision-maker for Hawk." SAC ¶¶ 15-16. These allegations are incorrect. Stream advanced exactly this argument in the Court of Chancery and lost. Stream sought a

18

deposition of Mr. Morton in the 225 Action, claiming that Mr. Morton was the "principal" of Hawk. In response to Stream's motion, Hawk produced an affidavit from Albany. *See* Ex. 2. The Albany Declaration stated that: (a) Albany is the sole director of Hawk; (b) Hawk is owned by the Morton Family Trust, and Mr. Morton is not a trustee of the Morton Family Trust; (c) Mr. Morton is not a director, officer, or manager of Hawk, and has no decision-making authority at Hawk; and (d) Mr. Morton is solely an investment advisor to Hawk, and it is Albany that decides what actions Hawk should take. Ex. 2 ¶¶ 1-4.

The Delaware Court of Chancery ordered Hawk to produce a 30(b)(6) witness with knowledge of decision-making at Hawk and the Morton Family Trust. Ex. 5 at 14:14-16:4.   Mr. Morton voluntarily agreed to sit for a remote deposition from his home in Barbados, despite the Court's holding that he was outside of its jurisdiction and could not be compelled to testify.  During the deposition, Mr. Morton confirmed the contents of the Albany Declaration. Mr. Morton testified that Albany, not Mr. Morton, exercised ultimate decision-making authority over Hawk. *See* Ex. 3 at 14:17-15:19; *id.* at 17:12-18:2.

Mr. Morton also testified that since 2016, including during the period of the alleged conspiracy, he has been dealing with serious health problems. *Id.* at 11:21-12:14. The Court of Chancery succinctly summarized the situation:

> Hawk asked whether Stream would object if it produced Morton, even if Morton turned out to be a tangential witness. Stream agreed not to object, and Hawk produced Morton. He turned out not to have been meaningfully involved in the negotiation of the Assignment Agreement, and he also suffered from health and memory problems associated with advanced age. The deposition lasted only one hour because it was evident to everyone that Morton was having difficulty.

*Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460 at *13.

Albany's declaration, Mr. Morton's testimony, and the Court of Chancery's summary directly contradict any allegation that Mr. Morton exercises complete domination and control over

Hawk. *See Mobil Oil*, 718 F.Supp. at 270.  In fact the direct evidence actually contradicts any assertion that Mr. Morton controls Hawk or Albany.  Plaintiff has thus failed to meet the standard for demonstrating that Hawk is the alter ego of Mr. Morton.

> **E.    Plaintiff Cannot Demonstrate a Constitutional Basis to Assert Jurisdiction over Mr. Morton**

Finally, even if Plaintiff could establish a statutory basis for jurisdiction in Delaware over Mr. Morton or Hawk, this Court cannot exercise jurisdiction over either because it would offend the Due Process Clause.  For jurisdiction to be appropriate under the Due Process Clause, three requirements must be satisfied: (1) "the defendant must have purposefully directed its activities at the forum"; (2) "the litigation must arise out of or relate to at least one of those activities"; and (3) "if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (internal quotations omitted).  With one exception, the SAC does not allege that Mr. Morton or Hawk purposely took any actions in Delaware, communicated with Delaware citizens, or that they availed themselves of the privileges of doing business in Delaware. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  The sole exception in the SAC are Stream's allegations that Hawk exercised its secured creditor rights and initiated the 225 Action, but for the reasons specified in Section I.B, those actions were not tortious and this litigation does not arise out of those activities.

## <u>CONCLUSION</u>

Defendants Hawk and Mr. Morton respectfully request that the claims in the SAC asserted against them be dismissed in their entirety, with prejudice.

Dated: March 13, 2023                  **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

-and-

Thomas A. Warns
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-4009
Tom.warns@klgates.com

*Attorneys for Defendants Hawk Investment Holdings Limited and Arthur Leonard Robert Morton*